Docket No. 102087.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LOUIS
PIATKOWSKI, Appellant.

*Opinion filed May 24, 2007.*

CHIEF JUSTICE THOMAS delivered the judgment of the court,
with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier
concurred in the judgment and opinion.

Justice Burke took no part in the decision.

**OPINION**

The issue presented in this case is whether an erroneous jury
instruction about eyewitness identification testimony rose to the level
of plain error so as to require a new trial. In 1996, defendant was
convicted of first degree murder for the shooting death of Pedro
Melquiadez and attempted first degree murder and aggravated battery
for shooting Jamie Fragoso. On appeal, the appellate court reversed
defendant's convictions and remanded the cause for a new trial.
*People v. Piatkowski*, No. 1–96–3827 (1999) (unpublished order
under Supreme Court Rule 23). Following a jury trial, defendant was
again convicted of the same crimes. His convictions were
subsequently affirmed by the appellate court. *People v. Piatkowski*,

No. 1–01–3766 (2003) (unpublished order under Supreme Court Rule 23). Defendant then filed a petition for leave with this court. We denied leave to appeal, but entered a supervisory order directing the appellate court to vacate its judgment and reconsider its decision in light of *People v. Herron*, 215 Ill. 2d 167 (2005), which involved the same jury instruction given in the present case. Following reconsideration in light of *Herron*, the appellate court affirmed defendant's convictions. No. 1–01–3766 (unpublished order under Supreme Court Rule 23). Defendant then filed another petition for leave to appeal with this court, which we granted (210 Ill. 2d R. 315(a)).

## BACKGROUND

At defendant's retrial in July of 2001, Jamie Fragoso testified that around 2:30 a.m., on July 4, 1994, he was sitting on the doorway stoop of an apartment building located at 1631 West Wallen in Chicago with his friends–Pedro Melquiadez, Erica Ladezma, Juan Morales, and Jose Soto–when he noticed a blue and white Astro conversion van turn onto Wallen. Wallen is a one-way street going west. The van proceeded very slowly, stopped for a few seconds and then drove on to where the group was sitting on the south side of the street. It finally stopped directly in front of them with its driver's side window down and with the driver's side of the van facing the group. The driver then turned in his seat, leaned outside the window and spoke to them for a few seconds. The driver was looking directly at Fragoso, and Fragoso could see the driver's face clearly for those few seconds because the street lights were working and they illuminated the whole area. Despite the fact that the driver's window was down, Fragoso could not make out what the driver was saying, however, so Fragoso turned to Ladezma and Morales to ask them what the driver had said. At that point, Fragoso heard gun shots coming from the van so he ducked down. He felt a bullet hit him in the head and saw flashes coming from the van. He and Melquiadez covered Ladezma with their bodies until there was a momentary pause in the firing. Fragoso and Ladezma then got up and started running east. As they did so, Fragoso was shot in the leg. In all, he heard about 20 shots fired.

Fragoso identified a photograph of the steps where he was sitting prior to the shooting, which showed the letters "L.K." above the door. Over defendant's objection, Fragoso testified that the letters "L.K." stood for the Latin Kings street gang, that he himself was a member of the Latin Kings in 1994, and that the area on Wallen where the shooting occurred was Latin Kings territory.

On January 11, 1995, over six months after the shooting, Fragoso identified defendant as the driver of the van and the shooter from a photo array of a total of five pictures shown to him by police. At a lineup conducted at the police station on February 3, 1995, Fragoso again identified defendant as the driver and shooter. Defendant was the only person depicted in the photo array and the lineup with a goatee. Fragoso also positively identified defendant at trial as the driver and shooter.

On cross-examination, Fragoso testified that he had seen two persons in the van on the night in question, but he did not get a good look at the passenger because Fragoso focused on the driver when he spoke. Fragoso noted that while he was undergoing treatment at the hospital for his wounds immediately after the shooting, he told a police detective that the driver was a "male white Hispanic" who had a goatee and that the passenger was Puerto Rican. Fragoso stated that he also noticed that the driver had protruding eyebrows and eyes that were "sucked in." He acknowledged, however, that he did not tell police anything about the driver's eyes. He also admitted that he did not notice on the night of the shooting whether or not the driver had dark eyes. When Fragoso was asked by defense counsel if he was able to identify defendant from the photo array and at the lineup because the person depicted in the photo and lineup had short hair, a mustache, a goatee and dark eyes, Fragoso responded in the negative and stated that he identified defendant because he recognized him as the driver.

On redirect examination, the prosecutor asked Fragoso what he had told the detective who interviewed him at the hospital about who might have done the shooting. Fragoso responded that he told the detective that his gang was having some problems with other gangs, such as the Black Gangster Disciples, Ashland Vikings and Simon City Royals. The area where the shooting took place was just a few

-3-

blocks from the Simon City Royals area. Defendant's objection to this testimony was overruled.

After Fragoso's testimony was completed, defendant renewed his objection to the gang testimony and moved for a mistrial. Prior to trial, the court had granted defendant's motion *in limine* to bar evidence of gang activity with the following exceptions: (1) a photograph of the doorway where the shooting took place that showed the letters "L.K." above the door; (2) testimony that "L.K." stood for Latin Kings; and (3) testimony from Fragoso himself that he was a member of the Latin Kings at the time of the shooting. The trial court denied defendant's motion for a mistrial.

Erica Ladezma testified that on July 4, 1995, at 2:30 a.m., she was sitting in front of a building at 1631 West Wallen talking with her friends–Fragoso, Melquiadez, Morales and Soto. They were discussing their plans for a Fourth of July picnic, when she saw a dark Astro van with white stripes turn onto Wallen. Mini blinds covered the rear windows of the van. After stopping briefly at two alleys, the van stopped in front of where Ladezma was sitting. The van had two occupants, and the driver's side of the van was facing her with the driver's side window down. The driver looked at her for 15 to 20 seconds, while she and her friends waited for him to say something. She also noticed that the passenger climbed out of his open window area and sat on the ledge of the window opening. In the meantime, the driver kept looking at her with his hands on the wheel. He then stretched out his arm with a gun in hand and pointed it at her and her friends. She heard gunshots and then felt Fragoso and Melquiadez pile over her, like they were trying to cover her.

During a momentary break in the shooting, she and Fragoso started to run. When they reached an alley, Fragoso told her that he had been shot, and she could see that he was bleeding from his head. Ladezma then went back to check on Melquiadez and found him unconscious on the ground. She held him until the paramedics came. When the police arrived at the scene, she told them that the driver of the van was a "male white Hispanic," with "really short" hair, who was wearing a tank top and a gold chain around his neck.

Ladezma further testified that in January 1995, she viewed two separate photo arrays. From the first photo array, she identified defendant as the driver of the van and the shooter. From the second

photo array, she identified Shondell Gray as the passenger in the van. She later identified defendant at a lineup and at trial as the driver of the van and the shooter. Defendant was the only person in the lineup with a goatee.

On cross-examination, Ladezma testified she did not know if the van had white wall tires and she did not remember whether she told a detective that the van had checkered-style hubcaps. She told the police detective at the scene that the driver was young. When defense counsel asked Ladezma, who was 25 years old at the time of the shooting, if she thought the driver was approximately Ladezma's age, she responded, "About, yes, twenties, somewhere around there." She also testified that the detective at the scene did not ask her if the driver had facial hair, and she did not remember telling the detective that defendant had a goatee. When asked if she had ever mentioned to any police officer that defendant had a goatee, Ladezma's response was ambiguous. She first noted that she thought she did mention it to police, but then added that she did not recall. After defense counsel rephrased the same basic question, she responded, "Yes, I think so. I did. I don't know." She denied stating in a prior proceeding that she picked defendant out of the lineup because he had a goatee. On redirect, she stated that the only reason she picked defendant out of the photo array and lineup was because he was the person she saw drive the van and then shoot and kill Melquiadez.

Chicago police detective Steven Stratton testified that he interviewed Ladezma on July 4, 1994, at the scene of the shooting. She told him that the vehicle involved was a dark Astro van with white stripes, and there were at least two persons in it. She described the driver as "a male white or white Hispanic," in his early twenties, who wore a black tank top and gold chain. In his police report dated July 4, 1994, Stratton noted that Ladezma described the suspect as "male/WH"; this is his own shorthand notation, which to him means "white or white Hispanic."

On cross-examination, Stratton stated that Ladezma never mentioned that the driver had a goatee. She said that the van had checkered hubcaps and white-walled tires. Ladezma did not describe any windows behind the driver's window of the van and did not mention mini blinds.

Chicago police detective Lawrence Thezan testified that he prepared two photo arrays in January 1995. From the first group of photos, Ladezma identified defendant as the driver of the van and the shooter. From the second group of photos, she identified Shondell Gray as the passenger of the van. Fragoso viewed the first group of photos and identified defendant as the driver and the shooter. Thezan further testified that he conducted a lineup on February 3, 1995, at which both Ladezma and Fragoso identified defendant as the driver and shooter. Ladezma and Fragoso were kept apart from each other for their respective identifications.

On cross-examination, Thezan testified that none of the persons depicted in the first group of pictures shown to the witnesses had a goatee. When defense counsel asked Thezan if the photo of defendant showed that he had hair on his chin, Thezan responded that there "appears to be something on his chin." With respect to the photograph of the lineup, which occurred three weeks after the witnesses were shown the photo array of the first group, Thezan acknowledged that defendant was the only person with a goatee. Thezan also acknowledged that the police report of defendant's arrest listed defendant's eye color as blue.

The medical evidence presented at trial showed that Melquiadez died of multiple gunshot wounds, including a shot that penetrated his lungs and heart. He had no drugs or alcohol in his system.

The forensic evidence presented revealed that 19 spent cartridges were recovered from the scene of the shooting–14 were fired from a nine-millimeter handgun and the other 5 were fired from a .45-caliber handgun. The cartridges were tested for fingerprints, but no usable images were obtained. The State's expert explained that this was not unusual because the intense heat of the burning gunpowder "fries" any prints off the cartridge cases. In his 20 years as a forensic investigator, he had never recovered a fingerprint from a fired cartridge.

The State rested, and defendant moved for a directed verdict. The motion was denied.

Defendant called one witness to testify on his behalf. Chicago police detective Andrew Sobolewski testified that he interviewed Fragoso at the hospital on July 4, 1994, following the shooting. Fragoso described one of the suspects as "a male white or Hispanic"

and the other suspect as "possibly Puerto Rican, with curly hair, short, combed back." Fragoso did not specify which description applied to the driver, and the detective was not able to ascertain at that time which description fit which suspect. The detective further testified that he did not recall Fragoso telling him that either of the suspects had a goatee or unusual eyebrows.

On cross-examination, Sobolewski testified that at the time of the interview, Fragoso was being prepared for transfer to another hospital for additional treatment. Thus, their discussion only lasted a few minutes. He explained that he did not want to interfere with Fragoso's treatment, so he did not ask him anything in depth at the time, like whether the suspects had any facial hair.

The parties stipulated that defendant was a few weeks short of his sixteenth birthday at the time of the shooting, as he was born on July 31, 1978. The parties further stipulated to the following additional matters. If called to testify, a court reporter would state that at a previous hearing in this case, Fragoso testified that the reason he identified defendant in the photo array and lineup was because of defendant's "short hair, his mustache and the goatee and his eyes, dark eyes he had." Additionally, another court reporter would testify that at a previous hearing in this case, Ladezma testified that she picked defendant out of the lineup because he had a goatee. Ladezma also testified at that same hearing that she picked defendant out of the photo array and lineup because she remembered his face.

The jury was given Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.15), which lists the five factors to consider in weighing identification testimony. Without any objection from the defense, the instruction separated the five factors listed with a disjunctive "or" between them.[1] The instruction given read as follows:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

---

[1] IPI Criminal 4th No. 3.15 was changed in 2003 to remove the "ors" between the factors. See IPI Criminal 4th No. 3.15 (Supp. 2003).

The opportunity the witness had to view the offender at the time of the offense.

[or]

The witness's degree of attention at the time of the offense.

[or]

The witness's earlier description of the offender.

[or]

The level of certainty shown by the witness when confronting the defendant.

[or]

The length of time between the offense and the identification confrontation."

During deliberations, the jurors sent several written notes to the trial judge. One asked for a definition of reasonable doubt and another requested a law dictionary. Two other notes requested transcripts of the testimony of Fragoso and Ladezma. The trial judge answered the jurors' request with written notes telling it that it had already had all the instruction needed to decide the case and that the transcripts were not available and that they should use their own recollection of the testimony to decide the case. The jury returned verdicts finding defendant guilty of first degree murder, attempted first degree murder and aggravated battery with a firearm. Defendant was sentenced to 45 years in prison for first degree murder to run concurrently with a 30-year sentence for attempted first degree murder. The aggravated battery with a firearm conviction merged into the attempted murder conviction.

The appellate court, with one justice dissenting, affirmed defendant's convictions after we remanded the cause for reconsideration in light of our decision in *People v. Herron*, 215 Ill. 2d 167 (2005). The appellate court majority noted that this court in *Herron* ruled that giving IPI Criminal No. 3.15 with the "ors" is error. No. 1–01–3766 (unpublished order under Supreme Court Rule 23), citing *Herron*, 215 Ill. 2d at 191. *Herron* found that an unpreserved, jury-instruction error is reviewed under the plain-error analysis. See No. 1–01–3766 (unpublished order under Supreme Court Rule 23),

citing *Herron*, 215 Ill. 2d at 191. Under that test, a new trial is required for this particular jury-instruction error of inserting the "ors" only if a defendant shows that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him.' " See No. 1–01–3766 (unpublished order under Supreme Court Rule 23), quoting *Herron*, 215 Ill. 2d at 187, 192-93. In *Herron*, the evidence was closely balanced, so the defendant was awarded a new trial. In the present case, however, the appellate court majority found that the evidence was not closely balanced, noting that "two eyewitness, on six different occasions, positively identified defendant as the shooter and driver." The appellate court dissent in the present case argued that the evidence was closely balanced because the witnesses did not know the suspect, had viewed him for only a short time on the date of the offense and defendant was the only person depicted in the photo array and lineup with a goatee. The dissent also noted that there was "no corroborating evidence, no confession and no physical evidence linking defendant to the crime." No. 1–01–3766 (unpublished order under Supreme Court Rule 23) (Theis, J., dissenting). We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315(a).

## ANALYSIS

Defendant argues before this court that he is entitled to a new trial because the jury was erroneously instructed about how to evaluate identification testimony. Defendant acknowledges that he failed to raise the jury instruction issue in the trial court, but argues that the cause should nonetheless be remanded for a new trial because he has met his burden to show that the plain-error test has been satisfied.

Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion. *Herron*, 215 Ill. 2d at 175. This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction. *Herron*, 215 Ill. 2d at 175.

Supreme Court Rule 451(c), however, provides that " 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.' " *Herron*, 215 Ill. 2d at 175, quoting 177 Ill. 2d R. 451(c). Rule 451(c) fashions a limited exception to the general rule to correct " 'grave errors' and errors in cases 'so factually close that fundamental fairness requires that the jury be properly instructed.' " *Herron*, 215 Ill. 2d at 175, quoting *People v. Hopp*, 209 Ill. 2d 1, 7 (2004). Rule 451(c) is coextensive with the plain-error clause of Supreme Court Rule 615(c), and the two rules are construed identically. *Herron*, 215 Ill. 2d at 175. Rule 615(a) states the following: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a).

In *Herron*, this court recently conducted an extensive analysis of the plain-error doctrine and concluded the following:

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain[2] error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove

---

[2]The word "plain" here is synonymous with "clear" and is the equivalent of "obvious." See *United States v. Olano*, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 519, 113 S. Ct. 1770, 1777 (1993). It is not used as a term of art, and we do not mean to imply that a defendant must somehow satisfy the plain-error test before determining whether the evidence in the case is closely balanced.

there was plain[3] error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [Citation.] Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) [Citation.] In both instances, the burden of persuasion remains with the defendant." *Herron*, 215 Ill. 2d at 186-87.

We now reiterate that the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the serousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. See *Herron*, 215 Ill. 2d at 186-87.

Turning to the above-mentioned test, we note that the first step is to determine whether error occurred in the giving of the instruction. This court has already determined that giving IPI Criminal 4th No. 3.15 with the "ors" is indeed clear and obvious error. See *Herron*, 215 Ill. 2d at 191. The reason that it is error is because, "[i]f the instruction initially directs jurors to consider all the facts and circumstances surrounding the identification, but then, through the use of the conjunction 'or,' directs jurors to consider one of five factors regarding the reliability of the identification, then the instruction contains an internal inconsistency." *Herron*, 215 Ill. 2d at 191. Moreover, it is ambiguous and misleading, regardless of any further comment on it by the prosecutor during closing argument. *Herron*, 215 Ill. 2d at 191.

Determining that the instruction was clear and obvious error, however, does not end our inquiry because *Herron* implicitly found that giving IPI Criminal 4th No. 3.15 with the "ors" was not an error

---

[3]See footnote 2, *supra*. Again, the word "plain" here is synonymous with "clear" and is the equivalent of "obvious." See *Olano*, 507 U.S. at 734, 123 L. Ed. 2d at 519, 113 S. Ct. at 1777.

so serious that reversal was required regardless of the closeness of the evidence. Thus, defendant must meet his burden to show that the error was prejudicial–in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence "closely balanced." *Herron*, 215 Ill. 2d at 193. When error occurs in a close case, we will opt to "err on the side of fairness, so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193.

Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge. The relevant inquiry for reasonable doubt purposes is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). A positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction. *People v. Vriner*, 74 Ill. 2d 329, 343 (1978). In the present case, the appellate court determined that the evidence was sufficient to convict defendant beyond a reasonable doubt. Defendant has abandoned any reasonable doubt challenge on review to this court, and we find that the evidence was sufficient to convict for reasonable doubt purposes, thereby precluding any double jeopardy claim on remand should we determine that a new trial is warranted. See *People v. Taylor*, 76 Ill. 2d 289, 309 (1979).

As to whether the evidence is nevertheless closely balanced, we begin by noting that defendant presented no alibi and no evidence whatsoever other than the testimony of Detective Sobolewski. But this is not fatal to his argument. Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial. The State, on the other hand, presented no physical evidence to connect defendant to the shooting, and no inculpatory statements by defendant were admitted. The only evidence linking defendant to the crime was the testimony of the two eyewitnesses. The erroneous instruction in this case related to how the jury would assess the reliability of that eyewitness testimony.

Thus, we must consider whether the evidence presented on the reliability of the eyewitness testimony rendered this case one that is

closely balanced. The five factors listed in the instruction are the same factors noted by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972), for assessing the reliability of identification testimony. Those factors include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.

After carefully examining defendant's argument in relation to the facts in the record, we find that the evidence presented on these five factors did not overwhelming favor the State, and we believe that defendant has met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial.

With respect to the first *Neil* factor, we note that Fragoso only viewed the suspect's face for a few seconds prior to the shooting. Similarly, Ladezma simply testified that the suspect looked at her for 15 to 20 seconds. Neither witness claimed to have previously known the suspect. We do not find that this first factor greatly favors the State.

Regarding the second factor, there is no indication that the witnesses were paying a great deal of attention to the driver's appearance, as they did not know that they would be fired upon and were not attempting to assess his appearance for a later identification. Moreover, neither witness testified that they had any opportunity to view the suspects after the shooting began.

Turning to the third factor, we note that the prior descriptions of the suspect given by the witnesses were fairly consistent with respect to defendant's actual appearance, yet there were arguably some discrepancies and questions raised. Neither of the witnesses' descriptions was very detailed. Ladezma described the suspect as having short hair, which matched the photograph shown to the witnesses six months later. However, the actual date the photograph was taken was not established at trial. Both witnesses described the driver as a "male, white Hispanic," but neither witness elaborated on what this meant to them. It was undisputed that defendant is actually a male Caucasian. Fragoso testified that he told the police at the

hospital that the suspect had a goatee, whereas Ladezma gave an ambiguous response about whether she ever told police prior to any identification that defendant had a goatee. The police testimony at trial, however, established that neither witness mentioned the goatee prior to their first identification. All of this ambiguity about the goatee could arguably be explained by the fact that defendant's goatee as shown in the photo array and lineup is a very weak one and does not greatly impact his appearance. Yet, it nevertheless does leave room for an argument as to the witnesses' credibility. There is also the matter of the parties' stipulation that both witnesses testified at a prior proceeding that the goatee was at least one factor in leading them to identify defendant. There was also a minor discrepancy between the actual age of the defendant at the time of the crime–15 years–and the approximate age of the driver that Ladezma gave to police–early twenties–though it could be fairly argued that this description was at least close to defendant's actual age and appearance.

Defendant emphasizes that Fragoso testified at the first trial in this case that the driver had dark eyes and dark eyebrows, but at the second trial, he testified that he did not notice whether the driver had dark eyes. Although photographs in the record show that defendant does in fact have dark eyebrows and eyelashes, Fragoso was impeached on the matter of whether he even noticed the driver's eyes on the night in question. Moreover, it was undisputed that defendant's eye color is blue. Under the circumstances, we are unable to say that the third *Neil* factor greatly favors the State.

The fourth and fifth factors–the level of certainty demonstrated at the confrontation and the lapse of time between the crime and the identification–also do not heavily favor the State. Even though neither witness testified as to his or her level of certainty, both made unequivocal identifications of defendant, identifying him in a photo array, a lineup and again at trial. Additionally, neither witness ever wavered from those identifications. But the first time that the witnesses were asked to make an identification of the suspect, some six months after the offense, they were shown just five photographs, and so they had a 20% chance of picking defendant out even if they had simply guessed. Defendant was also the only suspect pictured with a goatee, albeit a barely discernible one, and both witnesses were impeached with their testimony from the first trial where they stated that they had identified defendant, at least in part, because of his

goatee. More importantly, the lapse of six months between the crime and the photo identification is "a seriously negative factor in most cases." See *Neil*, 409 U.S. at 201, 34 L. Ed. 2d at 412, 93 S. Ct. at 383. Although such a long delay between the crime and the identification is not enough to overturn a conviction on reasonable doubt grounds, it can be considered "significant" and goes to the weight of the evidence to be considered by the jury. *People v. Holmes*, 141 Ill. 2d 204, 242 (1990).

This case turned on the credibility of the witnesses' identification testimony and the erroneous instruction involved how the jury would weigh and evaluate such identification testimony. While we do not mean to imply that a new trial is required in every case where this particular erroneous-identification instruction is given and the only evidence against defendant is identification testimony, we believe that a new trial is required in this case under the totality of the circumstances, particularly where the witnesses were only able to view the suspect for as little as a few seconds, did not previously know the suspect, some discrepancies existed in their prior descriptions and a lapse of more than six months occurred from the crime to the identification.

A number of cases have found that the error of using the "ors" in IPI Criminal 4th No. 3.15 was not prejudicial because the evidence was not closely balanced. See *Herron*, 215 Ill. 2d at 192 (collecting cases). But these cases are all easily distinguishable based on the quantum and quality of evidence presented by the State against the defendants in those cases. For example, in *People v. James*, 348 Ill. App. 3d 498 (2004), three eyewitness identified the defendant, and each of those witnesses had known the defendant from the neighborhood. In *People v. Sims*, 358 Ill. App. 3d 627 (2005), the witness did not identify the defendant until 14 months after the shooting, but she explained that she had known the defendant for seven years and was afraid to come forward sooner. The State also presented inculpatory statements from the defendant establishing that he had done the shooting. In *People v. Carrero*, 345 Ill. App. 3d 1 (2003), the victim, who was robbed at gunpoint, gave the license plate number of the getaway vehicle to police and identified the defendant just 15 minutes after he was apprehended in the vehicle matching the plate number given by the witness. In *People v. Mercado*, 333 Ill. App. 3d 994 (2002), the witness' identification was corroborated by

the defendant's confession and the physical evidence. In *People v. Furdge*, 332 Ill. App. 3d 1019 (2002), the identifying witness had known the defendant from the neighborhood for many years and identified the defendant from a photo lineup within one day of the shooting.

We find that this case is closer factually to *Herron* and *People v. Gonzalez*, 326 Ill. App. 3d 629 (2001), two cases where the error was found to be prejudicial because of the closely balanced evidence. In *Gonzalez*, there were two eyewitness, but no other physical or corroborating evidence. One eyewitness was unable to tell police shortly after the shooting "whether the gunman was African-American or Hispanic." *Gonzalez*, 326 Ill. App. 3d at 633. The other eyewitness described the suspect as having a mark on his neck and a gold tooth. Neither witness had previously known the defendant. The defendant presented alibi testimony at trial, as well as the testimony of his dentist stating that none of the defendant's teeth had ever been reduced for a crown. The appellate court found that the evidence was close, and the defendant was therefore prejudiced by the error. *Gonzalez*, 326 Ill. App. 3d at 641.

In *Herron*, an armed robbery at a hotel was committed by two men with hoods that covered their foreheads. Several hotel employees witnessed the robbery, but only one them could identify the defendant as one of the robbers. The identification was made 15 months after the robbery at a lineup. One other witness who viewed the lineup could not identify the defendant. There was no physical evidence linking the defendant to the robbery. The defendant made a statement to police that placed him at the hotel, but the statement did not specifically implicate him as one of the armed gunmen. This court found that the evidence was close and that the jury's verdict may have been different with a different instruction. *Herron*, 215 Ill. 2d at 193-94. We find *Herron* and *Gonzalez* to be ample support for our conclusion that a new trial is required in this case due to the jury-instruction error.

## CONCLUSION

For the foregoing reasons, we conclude that defendant has satisfied his burden to show that the evidence was closely balanced and that plain error occurred. For the foregoing reasons, we reverse

the judgments of the circuit and appellate courts and remand the cause to the trial court for further proceedings consistent with this opinion.

*Judgments reversed;*
*cause remanded.*

JUSTICE BURKE took no part in the consideration or decision of this case.