2021 IL App (1st) 181401-U

No. 1-18-1401

Order filed March 5, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 19229 |
| | ) | |
| DAVONTA WILLIAMS, | ) | Honorable |
| | ) | Evelyn B. Clay and |
| Defendant-Appellant. | ) | Angela Munari Petrone, |
| | ) | Judges, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's denial of defendant's motion to withdraw his guilty plea over his contention the court deprived him of his right to assistance of counsel during the hearing on his motion.

¶ 2    Defendant Davonta Williams, pursuant to a negotiated plea, pled guilty to first degree murder (720 ILCS 5/9-1(a)(3) (West 2010)) in exchange for a 34-year sentence. He appeals from the circuit court's denial of his motion to withdraw his plea. Defendant contends the circuit court

failed to comply with Illinois Supreme Court Rule 604(d) (eff. Jul. 1, 2017) by conducting a *Krankel*-like (*People v. Krankel*, 102 Ill. 2d 181 (1984)) postplea hearing on his motion to withdraw and, therefore, violated his due process rights by restricting his right to have counsel's assistance in presenting the motion. For the following reasons, we affirm.

¶ 3      Defendant was charged, along with codefendants Sean Williams (Sean) and Jennifer Vojinovic, with 93 counts relating to an incident on October 18, 2011, where defendant and Sean entered Krystal Hethcoat's residence, took various items, tied up Hethcoat's teenage children, Reyna and Andre Vasquez, and shot and killed Andre.[1] Among the charges were 16 counts of first degree murder, one count of attempted murder, and multiple counts of home invasion, armed robbery, and aggravated kidnapping.

¶ 4      In July 2016, the court determined defendant was fit to stand trial and would have been able to understand *Miranda* warnings at the time of his arrest in the instant case. On February 21, 2017, at the plea hearing, the State informed the court it had offered defendant a 34-year sentence on one count of first degree murder premised on his shooting and killing Andre Vasquez while armed with a firearm during the commission of a forcible felony, the home invasion of Hethcoat. It also informed the court defendant had "picked up" a subsequent case for aggravated battery of a correctional officer, which would have a sentence consecutive to any sentence he received in the instant case.

¶ 5      The court admonished defendant that, if he proceeded to trial, he faced a minimum of 56 years' and a maximum of life imprisonment for first degree murder and attempted murder. The court asked defendant if he understood the potential sentencing range if he was found guilty after

_____

[1] Codefendants Sean and Vojinovic are not parties to the instant appeal.

a trial "versus" the State's offer of 34 years' imprisonment, and defendant stated, "Yes." Defendant then stated, "I said I would take [the offer], but I want to see what -- if the other charges get thrown out, too, like the ones I caught here."

¶ 6     Following a recess, the State agreed to amend the first degree murder count to remove the "shot" and "armed with a firearm" language. It also agreed to nol-pros the remaining counts in the instant case and defendant's newer aggravated battery case. The State specified defendant would be required to serve 100 percent of his sentence. When the court asked if defendant's sentence was extendable, the assistant State's Attorney (ASA) responded,

> "There's no extendability, there's no enhancements. *** He is being sentenced as if this was truly a straight first degree murder with a range of 20 years.
>
> THE COURT: To 60?
>
> [ASA]: Yes, Your Honor."

¶ 7     Defendant agreed to plead guilty to first degree murder for killing Andre Vasquez during the commission of a forcible felony, the home invasion of Krystal Hethcoat, in exchange for a 34-year sentence. The court again stated that the sentencing range for first degree murder was 20 to 60 years, to be served at 100 percent, and with a 3-year mandatory supervised release (MSR) period. Defendant stated he understood and still wished to plead guilty. He acknowledged that he was pleading guilty of his own free will, no one forced him to accept the State's offer, and he was not promised anything in exchange for his plea. Further, the court asked defendant whether his attorney forced him to accept the State's offer, and he responded, "No."

¶ 8     The factual basis for the plea established that, on October 18, 2011, defendant and Sean entered Hethcoat's home on the 3400 block of North Lawndale Avenue where they tied up her 14-

year-old daughter Reyna and her 15-year-old son Andre. Hethcoat recognized Sean, who stated, "I didn't want things to be like this, but your boyfriend messed with the wrong people." He then used a "deadly weapon to kill Andre during the home invasion." Andre died as a result of injuries to the head and the manner of death was homicide.

¶ 9     A man observed defendant with Sean in the alley behind Hethcoat's residence walking toward a Mercury Cougar and later identified both in physical lineups. He would identify defendant in court.

¶ 10    A tow truck driver monitoring radio transmissions of a home invasion on his scanner observed a Mercury Cougar matching the description from the transmission. He saw a woman driving the vehicle and two male passengers. The two men exited the vehicle at Sawyer Avenue and Wilson Avenue, where Sean removed two weapons from his jacket and threw them in nearby bushes. The tow truck driver and another individual identified defendant in show-up identifications as the person hiding near the bush with Sean while Sean hid two weapons. Defendant was searched and officers recovered from his pocket three latex gloves, a box of jewelry, a switchblade, an iPod, two electronic keys, all of which belonged to the victims.

¶ 11    On the same date, defendant gave a statement to a Chicago police detective after waiving his *Miranda* rights. Defendant stated that he and Sean had staked out the Lawndale residence earlier that day. Someone opened the door to the residence and the two men entered. Defendant "duct-taped everyone" and Sean instructed them to go downstairs. Defendant had stolen the duct tape from a K-Mart store to ensure the receipt did not get traced back to him. Defendant searched the house and made two trips to the car with various items from the residence, including a television and Xbox game system. He found a 9-millimeter gun in a bedroom and gave the gun to

Sean. He told Sean not to do anything to the residents because he believed the older lady recognized Sean. Both defendant and Sean wore t-shirts over their faces and waited in the hallway "for a long time" until someone opened the door.

¶ 12    Defendant also told a volunteer stand-in for a physical lineup that he and another man killed a male and female and robbed their house. Defendant stated they stole a flat screen television, money, and marijuana, and attempted to hide the weapons on the street.

¶ 13    The court accepted the plea. It found defendant was advised of his rights and understood them, was advised of the nature of the charge and the range of penalties that applied, and the plea was voluntary and supported by a factual basis. When asked if he had anything to say before sentencing, defendant stated, "I just say I'm sorry to the victim's family. I apologize. I was 17 [years' old]. I made a mistake. I'm sorry." The court thereafter sentenced defendant to 34 years' imprisonment, "a 100 percent sentence on a charge of first degree murder," followed by 3 years of MSR. The court advised defendant of his appellate rights and the steps he was required to take prior to appeal. At the end of the hearing, defendant stated, "Thank you for being a good judge."

¶ 14    On March 21, 2017, defendant mailed a *pro se* motion to withdraw his guilty plea. He attached a handwritten letter to his motion claiming plea counsel "forced" him to plead guilty and lied to him regarding his sentence, the circuit court never ruled on his request to proceed *pro se*, and he was on medication on the date of the plea hearing which "clouded" his judgment. Specifically, defendant claimed he made a mistake by pleading guilty, and plea counsel told him he could face the death penalty "if they bring it back." Plea counsel further informed him that 34 years "was the lowest time he could get [defendant] and 'when' [he] have trial [*sic*] he wasn't going to try and get [defendant] a lower number because [defendant] should have taken the offer."

¶ 15    Additionally, defendant claimed plea counsel "repeatedly lied" to him regarding the sentencing range he faced due to his age at the time of the offense and told him that "34 years at 100% meant [he] would only do half of that in jail and the rest of it on parole if [he] was good in prison." Defendant claimed other inmates informed him he would "do all of it straight" but plea counsel "said he is the lawyer and went to school for this." Defendant additionally argued that he had requested to go *pro se* in "Nov-Dec 2016," but the court never addressed his request at the plea hearing, and his request was never ruled upon.

¶ 16    On May 12, 2017, the circuit court appointed counsel to represent defendant for his postplea proceedings.

¶ 17    On June 23, 2017, postplea counsel filed an amended motion to withdraw the plea incorporating defendant's *pro se* motion. Counsel subsequently informed the court the amended motion "incorporated and replace[d]" defendant's *pro se* motion. In the amended motion, defendant first argued he should be permitted to withdraw his plea because he was under a misapprehension of the law at the time he pled. Based on discussions with plea counsel, he mistakenly believed he was death penalty eligible, which led him to accept the plea. Next, defendant argued that, although he was ultimately determined fit to stand trial, he was "not provided the requisite hearing to truly determine his fitness" and justice would not be served if his plea were to stand.

¶ 18    Defendant attached his affidavit to the amended motion, stating "it was [his] understanding based on [his] conversation with [his] then attorney that the offered plea deal was a good one

because Illinois was considering bringing back the death penalty and I would potentially be eligible for the death penalty."[2]

¶ 19    Defendant's case was subsequently transferred to a different circuit court judge.

¶ 20    On August 9, 2017, postplea counsel filed a certificate pursuant to Rule 604(d) (Ill. S. Ct. R. 604(d) (eff. Jul. 1, 2017)) stating he (1) consulted in person with defendant regarding his contentions of error with respect to his guilty plea, (2) reviewed the circuit court file and transcripts, and (3) filed the amended motion to withdraw the plea.

¶ 21    On the same date, the circuit court held a hearing on defendant's amended motion to withdraw. The court noted it read the amended motion and "two letters that were written by the defendant." It "summarized" defendant's arguments as ineffective assistance of plea counsel and "a fitness issue." Postplea counsel declined to make an opening statement and instead stated he would "rely on the pleadings."

¶ 22    Plea counsel was called as a witness. Prior to counsel's testimony, the court stated,

> "Per People versus Jolly, *** 2014 IL 117142, I believe that at the preliminary hearing inquiry stage regarding the allegations of ineffective assistance of counsel, it would be error if I were to allow either defendant counsel, the defendant, or the State to question [plea counsel], so for that reason, I was going to question him myself. Do the parties agree on my reading of that case law?"

The parties agreed with the court and the hearing proceeded only on the ineffectiveness claim.

---

[2] We note that there appears to be only the first page of defendant's affidavit included in the record on appeal. However, the rest of his affidavit is not necessary to our disposition of the procedural issue under review.

¶ 23    The following testimony was elicited by the circuit court. Postplea counsel testified he was a public defender assigned to the Multiple Defendant Division and had been working on homicide cases for four years. He represented defendant in the instant case since 2013 or 2014 and had visited defendant in Cook County jail "[a]t least 10 times." Counsel discussed defendant's case with him at the jail, every court date, several times on the phone, and via several letters he sent defendant. Counsel never got the impression that defendant could not understand him and did not have trouble communicating with him.

¶ 24    Regarding defendant's previous behavioral clinical examinations, counsel testified he had filed a motion to suppress statements to police based on defendant's assertion that he had "some trouble" understanding police officers and thus his rights. Based on counsel's motion, the ASA requested a behavior clinical examination. However, counsel never had a *bona fide* doubt of defendant's fitness. Defendant's answers to counsel's questions were responsive.

¶ 25    Counsel spoke with defendant regarding his options, including pleading guilty or going to trial. In light of the "mountain of evidence" against defendant, counsel believed "there was no end game that [he] could see where [they] could poke a hole in the State's case and try and *** outright win a murder trial, whether by bench or by jury." Consequently, counsel discussed pleading guilty with defendant. Counsel negotiated a plea to an amended count of first degree murder that did not include a sentencing enhancement. Additionally, counsel negotiated to have defendant's subsequent "aggravated battery against a jail guard" case and "all of the consecutive counts" dismissed. The final negotiated plea "was almost half of what the minimum would have been had [they] failed to prevail at trial."

¶ 26     Counsel told the court defendant "absolutely" understood the nature of the proceedings. Starting in 2015, defendant had been working with "Gang Intelligence" in the jail "to create some currency in effect to get a better offer." He was negotiating information "in the street" that could be used for future prosecutions of other individuals in exchange for a better plea offer in the instant case. On multiple occasions defendant requested a plea offer, and there were years of negotiations with the State "always at [defendant's] instance [*sic*]." Counsel believed the State's original offer was around 50 years' imprisonment.

¶ 27     When the State initially offered 34 years' imprisonment in exchange for a guilty plea in 2016, defendant declined and counsel "could understand that given it's a long sentence, it's 100 percent of the time" and believed he would go to trial. Counsel never informed defendant his sentence would be served at 50 percent of the time. On the date of the plea, the court gave counsel and defendant ample time—over an hour—to discuss the plea and defendant was not satisfied. However, the State twice refused a "better offer" and defendant accepted. During the hour break in the proceedings, counsel did not have trouble communicating with defendant. Defendant's demeanor was not different than the other times they had communicated.

¶ 28     Counsel had spoken to defendant on multiple occasions about proceeding *pro se*. Defendant had mentioned he "might want to do it" and counsel informed him that was his "absolute right." Counsel believed it was a "tactic" and that defendant "understood that with a case of this severity, it would be very dangerous for a person to try and represent themselves." When asked whether defendant insisted on representing himself, counsel stated, "It wouldn't have ever been an insist issue. What I would tell any client when they go *pro se* is just tell the judge." Counsel acknowledged that defendant proceeding *pro se* "may" have been brought up "once and again."

¶ 29    Counsel had no specific recollection regarding whether defendant stated he was experiencing side effects from medication. While defendant may have complained of headaches, he never asked for further medical attention or stated he had any cognitive issues. Defendant did not complain about being unable to understand the proceedings or claim that he took medication on the morning of the plea which clouded his judgment. To the contrary, on the morning of the plea hearing, counsel extensively discussed a supreme court case with defendant regarding whether juveniles could be given the equivalent of natural life imprisonment "so it's not just that [counsel] didn't have any worries about his cognitive ability, it's *** [defendant] was arguing case law and his interpretation was different than [counsel's] but it *** wasn't terrible. It wasn't far off." He did not have a *bona fide* doubt of defendant's fitness at the time of the plea.

¶ 30    Counsel denied lying to defendant, forcing him to plead guilty, and telling him that he would receive the death penalty. Rather, counsel admonished defendant that the sentencing minimums were "draconian" and "in the mid 60s" because it was his duty to ensure defendant was aware of the sentencing range. Counsel also denied informing defendant that he would "not try" to get a lower sentence if they proceeded at trial. As had been explained to defendant by the court, if defendant was found guilty at trial, the law prevented counsel from being able to obtain a sentence under "the minimums" which counsel characterized as "horrifying" in this case.

¶ 31    Counsel additionally spoke with defendant about whether his sentence would be "different" than another adult based on his age. Counsel, relying on "Montgomery and Miller and Reyes," discussed with defendant his "fear" that what is considered "natural life" had not been defined and it was possible he could receive a 50-year sentence. Counsel denied telling defendant that the prior circuit court judge ruled he could not go *pro se* because of his education and explained defendant

was present for every communication with the court. He also denied telling defendant that "100 percent" meant he would serve half his sentence in jail and half on parole. Counsel clarified that is the opposite of what the court had told him when defendant chose to take the offer.

¶ 32    Finally, counsel testified the sentencing structure was "so rigid under the law" and, due to consecutive sentences, the various outcomes at trial would have resulted in a sentence significantly higher than the State's 34-year offer.

¶ 33    The court then asked the parties whether they had additional witnesses. Both said they did not, and the hearing proceeded to closing arguments. Postplea counsel argued in closing that the issue raised in the motion regarding defendant's misapprehension as to what he was told and how he understood it related to his fitness and asked that the court reserve ruling until after a retroactive fitness hearing.

¶ 34    The court stated it planned on reserving ruling on "that issue" until after a retroactive fitness hearing. Regarding plea counsel's ineffectiveness, the court then stated it found plea counsel testified credibly and had "very good recall." The court stated defendant had "full understanding, at least to [plea counsel] of what he was doing when he pled guilty and was able to communicate with [plea counsel]." The court found plea counsel's performance did not fall below an objective standard of reasonableness and nothing showed defendant suffered prejudice.

¶ 35    The court further found the transcript of the plea hearing showed defendant actively participated in the negotiations. The court recited portions of the transcript, which it found showed the court informed defendant "multiple multiple" times, and defendant understood he would have to serve 100 percent of his sentence. The court found there was no misunderstanding about "50 percent" and defendant was informed of the potential sentencing range he faced if he went to trial,

which was 56 years' imprisonment to natural life. The court stated there was no unresolved issue regarding defendant proceeding *pro se*, there was no complaint made regarding plea counsel, and defendant made a "cognizant" and "thoughtful" apology to the victim's family in court. It concluded there was "no misapprehension of the facts or the law," and defendant had not shown ineffective assistance of plea counsel. The court then continued the matter for a retroactive fitness hearing.

¶ 36    On December 18, 2017, the court held the retroactive fitness hearing. The parties again waived opening statements. The State called Dr. Nishad Nadkarni, who testified as an expert in forensic psychiatry. Dr. Nadkarni extensively testified regarding his review of defendant's medical history, the plea transcript, and his in-person evaluation of defendant. Ultimately, he concluded that defendant was "retrospectively fit to plead guilty on February 21, 2017" and there was no evidence he was manifesting side effects or difficulties from his medication that would have clouded his judgment and decision-making on the day of the plea hearing. The court found defendant was retroactively fit to plead guilty, understood the nature of the proceedings, and was not taking medication which clouded his ability to plead guilty and make decisions.

¶ 37    On June 19, 2018, defendant mailed his motion for late notice of appeal, which we allowed on July 6, 2018.

¶ 38    On appeal, defendant argues the circuit court failed to comply with Illinois Supreme Court Rule 604(d) by incorrectly conducting a *Krankel*-like (see *Krankel*, 102 Ill. 2d 181) hearing procedure at the hearing on his motion to withdraw his plea, which significantly restricted his right to representation of counsel and his right to fully present the merits of his motion.

¶ 39    Rule 604(d) provides, in relevant part, that when a defendant files a motion to withdraw a plea of guilty, "[t]he motion shall be presented promptly to the trial judge," and "the trial court shall then determine whether the defendant is represented by counsel, and if the defendant is indigent and desires counsel, the trial court shall appoint counsel." Ill. S. Ct. R. 604(d) (eff. Mar. 8, 2016). Further, "[t]he motion shall be heard promptly, and if allowed, the trial court shall modify the sentence or vacate the judgment and permit the defendant to withdraw the plea of guilty and plead anew." Ill. S. Ct. R. 604(d) (eff. Jul. 1, 2016). A defendant's right to withdraw his guilty plea is not absolute, and he "bears the burden of demonstrating to the trial court the necessity of withdrawing his plea." *People v. Artale*, 244 Ill. App. 3d 469, 475 (1993) (citing *People v. Smithey*, 120 Ill. App. 3d 26, 31 (1983)). "It is within the sound discretion of the trial court to determine whether a guilty plea may be withdrawn, and, on appeal, this decision will not be disturbed unless it is an abuse of that discretion." *Id.* (citing *People v. Davis*, 145 Ill. 2d 240, 244 (1991)); *People v. Church*, 334 Ill. App. 3d 607, 615 (2002).

¶ 40    In contrast to proceedings on a motion to withdraw where the defendant has a right to representation, during a preliminary *Krankel* inquiry a defendant is not represented by counsel. *People v. Fields*, 2013 IL App (2d) 120945, ¶ 37. Rather, pursuant to *Krankel* and its progeny, when a defendant makes a postplea allegation that plea counsel was ineffective, the court conducts a limited inquiry to determine whether the allegations are such that the court must appoint new counsel to assist the defendant in presenting his claims. *See e.g.*, *People v. Ayres*, 2017 IL 120071, ¶ 11. The goal of the court's inquiry is to permit the defendant "to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Ayres*, 2017 IL 120071, ¶ 20.

¶ 41    In making this inquiry, " 'some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible.' " *People v. Jolly*, 2014 IL 117142, ¶ 30 (quoting *People v. Moore*, 207 Ill. 2d 68, 78 (2003)). Consequently, "the trial court may inquire with counsel about the facts and circumstances surrounding the defendant's allegations." *Jolly*, 2014 IL 117142, ¶ 30. Because a preliminary *Krankel* hearing "should operate as a neutral and nonadversarial proceeding," it is "best served by having a neutral trier of fact initially evaluate the claims at the preliminary *Krankel* inquiry without the State's adversarial participation." *Id.* at 38.

¶ 42    Here, defendant's motion to withdraw his plea alleged, in relevant part, that his plea counsel lied to him and misled him regarding the sentence he faced, *i.e.* plea counsel was ineffective in advising him regarding the plea. The circuit court appointed postplea counsel to represent defendant on the motion, counsel filed an amended motion, and the court conducted a hearing on the motions. However, because defendant's claim involved an ineffective assistance of counsel claim and citing *Jolly*'s procedure for conducting a preliminary *Krankel* inquiry to determine whether counsel should be appointed on an ineffective assistance of counsel claim, the circuit court did not allow postplea counsel to participate in questioning the witness, plea counsel, during the hearing.

¶ 43    It is this procedure that defendant challenges on appeal, arguing the *Krankel* procedure was inapplicable to his motion to withdraw his guilty plea, an entirely different procedural posture. He argues the court denied him the opportunity to meet his burden to demonstrate the necessity of withdrawing his plea when it effectively removed plea counsel by denying counsel the right to present and develop defendant's claim through cross-examination of plea counsel.

¶ 44     As an initial matter, defendant acknowledges postplea counsel failed to object to the circuit court's application of the alleged incorrect procedure. He asserts the issue is not forfeited however, because it involves the conduct of the trial judge. The State responds that not only did defendant forfeit the issue by failing to object below, but he invited the error by agreeing to the circuit court's proposed procedure. Defendant replies that counsel cannot be expected to correct the court where it is unequivocal in its intent to follow a particular path. He also argues that, even if this court finds counsel should have objected to the court's incorrect process, we should review the error under the second prong of the plain error doctrine. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (noting that raising plain error for the first time in the reply brief is sufficient to enable appellate review of the issue).

¶ 45     We find defendant affirmatively waived the issue. The rule of invited error or acquiescence is a procedural default, as

> "a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 46     Here, postplea counsel verbally agreed with the circuit court's statement that, pursuant to *Jolly*, 2014 IL 117142, it would be improper to allow the parties' respective counsels to question plea counsel and, instead, only the court should question plea counsel, and raised no subsequent objection. Postplea counsel's acquiescence functioned as defendant's affirmative waiver to challenge the issue. *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 20.

¶ 47    The plain-error doctrine provides a narrow and limited exception to the rule of procedural default. *Id.* ¶ 19. The doctrine allows a reviewing court to consider unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 48    However, acquiescence is not subject to the plain-error doctrine. *Id.* Where, as here, a party acquiesced in proceeding in a given manner, "he is not in a position to claim he was prejudiced thereby." (Internal citation omitted.)  *Id.* The plain-error doctrine is founded upon prejudice. *Id.* ("Under the first prong, defendant bears the burden to establish prejudice, and under the second prong, prejudice will be presumed where the error is sufficiently serious"). Thus, because postplea counsel's acquiescence functioned as defendant's affirmative waiver to challenge the issue, defendant cannot claim he was prejudiced by the court's procedure and the issue is not subject to plain error review. *Id.* Accordingly, defendant has affirmatively waived his right to argue the circuit court improperly conducted the hearing on the motion to withdraw the plea, even under the plain error doctrine. *Id.* ¶ 20.

¶ 49    For the foregoing reasons, we affirm the denial of defendant's motion to withdraw his plea.

¶ 50    Affirmed.