**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190182-U

Order filed July 22, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| | ) | Appeal No. 3-19-0182 |
| v. | ) | Circuit No. 18-CM-165 |
| | ) | |
| TIMOTHY M. FULK, | ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Lytton and Wright concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court failed to ask each potential juror whether he or she understood and accepted the principles set forth in Illinois Supreme Court Rule 431(b), but this plain error is not subject to reversal because the evidence is not closely balanced.

¶ 2     Defendant, Timothy M. Fulk, appeals his conviction for domestic battery. He contends that his conviction should be reversed, and the matter remanded for further proceedings because the Kankakee County circuit court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                   I. BACKGROUND

¶ 4        The State charged defendant with two counts of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)) alleging that on March 24, 2018, he caused bodily harm to Kresha Taylor by striking her in the head with his hand and grabbing her about the neck with his hands. The matter proceeded to a jury trial.

¶ 5        During jury selection, the court advised the first panel of prospective jurors that it was going to ask them individually, "Do you understand and accept the following principles of constitutional law ***[?]" It then proceeded to set forth the four principles required by Rule 431(b). The court then told the prospective jurors that "I'm gonna call your name off and ask you—ask you if you can accept and following [*sic*] these principles of constitutional law." When the court called their name, each juror responded affirmatively. The court similarly addressed the second panel of prospective jurors by first stating that it was going to ask each of them if they "accept and understand the following principles of constitutional law," proceeding to set forth those principles and then asked if the jurors could "accept and follow those principles." All the prospective jurors answered affirmatively. Defendant did not object to the way the court questioned the prospective jurors.

¶ 6        Taylor testified that on March 24, 2018, she lived at 104 West Fourth Street in Aroma Park. Defendant was her husband. They had eight children together and she was currently pregnant. At the time of trial, Taylor and defendant were married and defendant was the main financial provider for the family. On March 24, defendant was living with Taylor, but had been staying at a motel for several nights because they had a dispute. On that night, Taylor was home with five of her children and defendant. Defendant had been there approximately three or four hours prior to the incident.

¶ 7    On that evening, Taylor had a conversation with a police officer that arrived. She stated that defendant had "like two beers" when he arrived at their residence. She may have told the officer defendant was drunk, but defendant was not. Taylor asked defendant to leave the residence, but she did not know why. Taylor did not remember telling the officer that she asked defendant to leave because he was intoxicated. When asked if she remembered telling defendant she would call the police if he did not leave, she said she did not recall and that she did not even recall asking him to leave. Taylor did not remember telling police that she tried to leave, and defendant grabbed and pushed her into the door. She did not recall telling police that she and her son, Brice, were able to run past defendant and go to the neighbor's house and added that "Brice wasn't following me out the door anyways if I walked out." She also did not recall telling the officer that she had to push defendant out of the way in order to leave her home or that she had to scratch defendant in her defense when trying to leave.

¶ 8    Taylor went to the neighbor's house but stated she goes there occasionally. Defendant did not follow her to the neighbor's house; she did not recall telling the officer that defendant chased her to the neighbor's house. She did not remember calling 911. When asked if she recalled telling the police that defendant pushed her into the railing at the neighbor's house, she stated that she tripped on the railing and defendant was not there. She did not remember telling the police that defendant pushed her or that defendant struck her in the back of the head. Taylor did not recall telling the officer that defendant grabbed her by the neck causing a scratch and injury to her neck and asserted that her "one year old son did that." She further did not recall telling the officer that defendant grabbed her by her arm causing an injury.

¶ 9    Taylor acknowledged that she spoke with the police on March 24. She initially denied signing a complaint but when shown a copy of a complaint for domestic battery, she admitted it

3

contained her signature. Taylor asked officers to remove defendant but insisted nothing happened. She stated that she wanted defendant removed because she has mental issues and was not in her right mind.

¶ 10 Other than signing a paper, Taylor denied filling out a statement or other paperwork, but when shown an exhibit titled "domestic violence victim fact sheet," she admitted it contained her handwriting. When asked if she wrote that "He grabbed me by my neck and punched me in the back of my head" on that document, she said she "probably did." Taylor identified her signature on the exhibit and admitted she filled it out. During cross-examination, Taylor denied that defendant struck her in the back of the head or punched her.

¶ 11 Taylor did not remember calling 911, but said she was sure she told 911 dispatchers to send officers to the residence because she wanted defendant removed. She was not sure if she or someone else called 911; she did not "really recall that night." Taylor testified that she did not tell the 911 dispatcher that her husband was beating her and that she definitely did not tell the dispatcher that her husband was beating her in front of her children. She further asserted that she did not tell the 911 dispatcher to hurry and send an officer. After this testimony, the State introduced the 911 tape into evidence and played it.

¶ 12 On the 911 tape, the caller can be heard providing her name as Kresha Taylor. She advised that she needed an officer at 104 West Fourth Street and that her husband was beating on her in front of her children. Taylor told the dispatcher her husband's name was Timothy Fulk and spelled out "F-U-L-K" when the dispatcher misheard her. When the dispatcher asked Taylor if she was injured she replied, "the back of my head." The dispatcher asked if anyone had been drinking; Taylor responded that her husband had been drinking a lot. Taylor told the dispatcher her husband

physically abused her, that he punched her in her head, and she had bumps on her neck. She asked a couple of times for the police to hurry.

¶ 13    Taylor stated that the officer took photographs of her neck. She told the officer that the injuries were caused by defendant grabbing her, but they were not, they were from her son. She was shown a photograph, and she stated the mark seen in the photograph was from her baby. Later, she denied telling the officer that the mark was caused by defendant. Taylor was shown another photograph and she said the photograph looked like it was of a hickey. She did not recall telling the officer that defendant caused the injury.

¶ 14    Taylor and defendant's son, Brice, who was nine years old at the time of the incident, testified that he did not remember the police coming to his house, the police coming to his neighbor's house, talking to a police officer earlier in the year, telling a police officer that "daddy grabbed mommy and punched her in the head," or that "mommy and daddy were fighting."

¶ 15    Officer Raymond Navratil testified at trial that he responded to a domestic battery call. When he arrived, Taylor was at the neighbor's house; she was upset and crying. Taylor made a comment that defendant hit her. When Navratil talked to Taylor she was upset, crying, and seemed scared. He observed injuries on Taylor. From a photograph exhibit, Navratil identified a scratch mark that Taylor had on her shoulder; Taylor indicated to him that she received the scratch from defendant. Specifically, Taylor got the scratch when defendant pushed or grabbed her around the throat and neck area. The photographs accurately depicted the injuries Navratil noted on Taylor on March 24.

¶ 16    Taylor told Navratil that defendant had been staying at a hotel because of a prior argument between them, but he had shown up at their residence. Taylor and defendant engaged in a verbal argument and Brice had to stand between them. Taylor wanted defendant to go back to the hotel,

but he would not leave. Taylor told Navratil that when defendant would not leave, she told defendant she would call the police. Taylor had to physically push defendant and scratch him across the chest to get him out of the way so she and Brice could leave. The State showed Navratil a photograph, which he identified as showing the scratch marks defendant received from Taylor. The photograph accurately depicted the injuries defendant had on March 24.

¶ 17        Taylor advised Navratil that defendant followed her to the neighbor's house and on the front porch, he pushed her against the railing, struck her in the back of the head several times, and grabbed her by the shoulders and throat area. Brice told Navratil that his father punched his mother and grabbed her.

¶ 18        According to Navratil, defendant was intoxicated. When Navratil placed defendant in custody, he became argumentative and loud; he screamed that they both have injuries so they both needed to go to jail. Although Taylor initially declined when Navratil asked her a second time if she wanted to sign a domestic battery complaint, Taylor signed it. She also partially filled out a domestic violence victim fact sheet, which Navratil left with her when he took defendant to jail. When he returned, Taylor indicated she was not going to fill out anymore, but she had already written that defendant grabbed her by the neck and punched her in the back of the head. Navratil did not force Taylor to sign the complaint or fill out the fact sheet. Navratil was not present when the incident occurred and did not see any contact between defendant and Taylor.

¶ 19        Carrie Stewart, the victim witness coordinator for the State's Attorney's office testified that she met with Taylor earlier that morning before trial. During that meeting, Taylor stated that defendant had followed her to the neighbor's house and slapped her on the back of her head.

¶ 20　　　　The jury convicted defendant and he filed a motion for judgment notwithstanding the verdict. The court denied the motion and sentenced defendant to 12 months' conditional discharge. Defendant appeals.

¶ 21　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 22　　　　Defendant argues that the court erred by asking prospective jurors if they could accept and follow the four principles set forth in Rule 431(b), rather than if they understood and accepted those principles. Defendant failed to properly preserve this issue for appellate review (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but he submits that it was a reversible plain error because the evidence was closely balanced. We find the court's erroneous Rule 431(b) admonishment does not warrant reversal, as the evidence is not closely balanced.

¶ 23　　　　The plain-error doctrine allows a forfeited error to be reviewed when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Belknap*, 2014 IL 117094, ¶ 48. When determining whether the evidence is closely balanced, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. The first step in applying the plain-error doctrine is to determine if an error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 24　　　　Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) provides that "[t]he court shall ask each potential juror, individually or in a group, whether that juror *understands and accepts*" (emphasis added) that defendant is presumed innocent, the State must prove defendant guilty beyond a reasonable doubt, defendant is not required to present any evidence on his behalf, and if defendant does not testify, it cannot be held against him. The circuit court here, while initially indicating it was going to ask the prospective jurors if they understood and accepted the principles,

7

actually asked whether they could accept and follow the principles. Thus, the court did not comply with Rule 431(b). However, this does not end our inquiry, as reversal is not warranted if the evidence is not closely balanced.

¶ 25    Here, while the matter essentially comes down to a credibility contest, we conclude the evidence is not closely balanced. See *Belknap*, 2014 IL 117094, ¶ 52 (noting a prior case, *People v. Adams*, 2012 IL 111168, where the supreme court overturned the appellate court's decision that concluded the evidence was closely balanced because of the conflicting testimony between the defendant and the officers). Taylor's denial, at trial, that defendant had punched or struck her was simply not credible in light of her assertions that she could not remember almost anything from the relevant night, the domestic battery complaint she admitted signing after initially denying she signed, the fact sheet whereon she wrote that defendant grabbed her by the neck and punched her in the back of the head, the 911 tape, which established that she told the dispatcher that her husband was beating her, and the inconsistencies during her trial testimony. Further undermining her credibility was Navratil's testimony that he observed Taylor upset and crying on the night in question, that he observed injuries on her documented through photographs, that Taylor told him defendant had struck her, and that Brice had told him defendant punched Taylor. Additionally, Stewart testified that as of the morning of trial, Taylor told her that defendant followed her to the neighbor's house and slapped the back of her head. In sum, this is not a case where there are two credible versions of events with no extrinsic evidence supporting either version as was the case in *People v. Naylor*, 229 Ill. 2d 584, 606-08 (2008). Instead, we have one credible version of events based on Taylor's own statements to the 911 dispatcher, Navratil, and Stewart, which were backed up by Navratil's observations and injuries to Taylor that were documented through photographs and one incredible version based on Taylor's inconsistent testimony, lack of memory, and

8

testimony directly impeached by her prior statements. Thus, the evidence is not closely balanced, and the court's Rule 431(b) error is not a reversible plain error.

¶ 26                                    III. CONCLUSION

¶ 27          For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 28          Affirmed.