**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210166-U

Order filed November 14, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0166 Circuit No. 17-CF-60 |
| JAMES E. BEALS, | ) ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Holdridge and Justice Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   (1) The trial court's Rule 431(b) error is not reversible under the plain error analysis where the evidence is not closely balanced. (2) The State did not commit prosecutorial misconduct.

¶ 2    Defendant, James E. Beals, appeals his conviction for first degree murder. First, defendant contends the trial court committed plain error by failing to ask each juror whether they understood and accepted the Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles. Second, defendant argues the State committed prosecutorial misconduct when it (1) described defendant's

sport utility vehicle (SUV) fire as intentional; (2) commented on defendant's right not to testify; (3) aroused the passions and sympathy of the jury; and (4) indoctrinated the jury venire with a predisposition to consider narcotics users testimony equal to all other witnesses. Defendant also argues the prosecutorial misconduct resulted in cumulative error. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4        The State charged defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)) alleging that on October 1, 2016, defendant shot Ralph Ledet with the intent to kill, resulting in Ledet's death. The matter proceeded to a jury trial.

¶ 5        Before jury selection, the State requested that the court ask several *voir dire* questions, including (1) "Would the fact that a witness admitted to ingesting narcotics affect how you would view the testimony?"; (2) "Could you judge the credibility of a person who has ingested narcotics the same as you would any other witness?"; and (3) "Do you have any biases against narcotics users which would prevent you from being a fair juror?" Defendant did not object to the proposed questions. During jury selection, the court explained to the entire venire:

> "I'm going to ask you if you can accept and follow these principles of constitutional law.
>
> One: The defendant is presumed innocent;
>
> Two: That before the defendant can be convicted, you must—the State must prove him guilty beyond a reasonable doubt;
>
> Three: The defendant is not required to offer any evidence on his own behalf;
>
> And four: If the defendant chooses not to testify, you can't infer any guilt.
>
> And I'll ask each one of you individually."

2

The court again advised all three panels of prospective jurors that it would ask them whether they "understand and accept" the four principles of law. After listing the principles, the court asked each juror whether they could "accept and follow" the principles. Then the court asked the prospective jurors the State's proposed questions regarding narcotics use. The court excused one potential juror for answering that he would be biased against narcotics users.

¶ 6        Before the State began its presentation, defense counsel made an oral motion asking the court to bar the State from making "any characterizations of [the SUV fire] as arson or even an *** allegation accusing [defendant] of intentionally setting the fire." Counsel reasoned that defendant was not charged with arson and the State failed to file an "other crimes" motion to "ask for those characterizations." In response, the State indicated that it sought to present "how [defendant said] his car started [on] fire and that he was smoking crack and he put his lighter down and that's how it started. [It was] not alleging it [was] a crime of starting the fire." The following discussion occurred:

> "THE COURT: [The State's] officer is only going to testify that it was accidental.
>
> * * *
>
> [THE STATE]: *** we'll play his tape of *** his own words—
>
> [DEFENSE COUNSEL]: That's fine. ***
>
> [THE STATE]:—that he was smoking crack and—
>
> THE COURT: Okay.
>
> [THE STATE]:—that's how it started.

THE COURT: Okay. So it sounds like [the State is] going to *** ask to play this tape, but it sounds like it's accidental. [Defendant has] not been charged with it.

[DEFENSE COUNSEL]: *** That's fine.

* * *

THE COURT: As long as the officer doesn't allude differently to it. Okay? So I—I think everything's in agreement. Okay?

***

THE COURT: As—as far as I can tell. I guess if there becomes an issue, we'll do an offer of proof to see what that is. Okay?

[DEFENSE COUNSEL]: That's fine, [Y]our Honor."

¶ 7    Erik Hance testified that he was at his home on the evening of September 30, 2016. In the middle of the night, Hance heard a "[t]humping of a vehicle that wasn't running very well," and it sounded like the vehicle was not "idling properly." Hance heard the vehicle stop, and soon after, heard a gunshot followed by another gunshot "[p]retty quickly afterwards." Hance immediately called 911, and while on the phone with the operator, he heard a third gunshot. Hance heard the vehicle start approximately 30 seconds after the third gunshot and observed the taillights through the window traveling south. Hance believed it was an "older" vehicle but could not provide more details. Following the incident, Hance saw that a cattle gate that had been intact earlier in the day had been removed from his fence.

¶ 8    On cross-examination, Hance explained that after the second gunshot, he heard "[m]uffled voices." Hance described an encounter he had earlier with Ricky Taylor who claimed to be the

4

new property owner of a home across the street from Hance. Given the location of Hance's residence, it was unusual to have vehicles drive by.

¶ 9        Paul Witoski testified that on September 30, 2016, he met with Leearius Williams at a trailer and used heroin. Soon after defendant arrived with Ledet. Witoski had not previously met Ledet. Witoski had consumed drugs and stolen a cattle gate with defendant in the past. Witoski did not know if defendant consumed crack the night of the incident. Witoski left with defendant and Ledet following a discussion about stealing a cattle gate. Ledet rode in the front passenger seat, and Witoski sat in the backseat. Witoski noticed defendant's SUV had a loud muffler. Defendant parked perpendicular to the cattle gate, and all three exited. Witoski did not see where defendant went. Witoski went to the left side of the gate, and Ledet went to the right side. They began cutting the gate with defendant's bolt cutters. Witoski heard a gunshot but did not know where it came from and thought someone was shooting at them. Witoski and Ledet returned to the SUV. A few minutes later, defendant entered, sat in the driver's seat, and shot Ledet in the head. Witoski observed defendant "just point[ ] over and sho[o]t him" with a "slide, automatic" firearm. Ledet slumped over toward the passenger side door. Witoski refused to help defendant remove Ledet from the SUV but watched as defendant opened the door, "pulled" Ledet out, and "put him down on the ground." Ledet was moaning, and defendant "bent over and shot him again." Witoski "started yelling and screaming" at defendant. Witoski reentered the SUV with defendant because he "wanted to get out of there." While in the SUV, defendant began fumbling with the firearm, and Witoski believed defendant was attempting to load a cartridge to shoot him. Defendant drove Witoski to another residence. Witoski observed defendant enter the residence for approximately 20 minutes before returning. After defendant drove several blocks up the road, Witoski jumped out of the SUV because he feared defendant would shoot him.

5

¶ 10    When speaking to police, Witoski did not initially disclose the murder because he "was scared." Witoski asserted he was truthful when he told police defendant shot Ledet. Witoski did not know whether defendant had planned to kill Ledet. Witoski had several felony convictions for violent offenses and several unrelated pending felony and misdemeanor charges. Additionally, the State charged Witoski with contempt for failing to appear in the present case pursuant to a subpoena to testify. Witoski did not have an agreement with the State to resolve his pending cases. On cross-examination, Witoski testified he initially told police that he and defendant dropped Ledet off at a gas station and watched him enter a car. In his second interview, Witoski failed to inform police of the residence defendant visited prior to returning to the trailer.

¶ 11    Williams testified that on September 30, 2016, he sold drugs to defendant and Ledet. Defendant and Ledet arrived together to purchase the drugs, and Witoski arrived separately. Williams sold defendant crack and observed that defendant had a firearm stamped with the word "Millennial." Williams sold Witoski heroin. Around midnight, defendant, Ledet, and Witoski left together in defendant's SUV. Defendant drove, Ledet sat in the front passenger seat, and Witoski sat in the backseat. Williams was in custody at the time of trial due to his failure to appear in court pursuant to a subpoena in this case.

¶ 12    On cross-examination, Williams said he was "high" on marijuana and Xanax on the night in question. Williams saw defendant and Witoski early the following day when Witoski retrieved his car. Williams did not see Ledet again. Initially, Williams did not disclose to police that he was selling drugs, and indicated he saw defendant, Ledet, and Witoski at a different location.

6

¶ 13        Corporal Emerson Rushing interviewed defendant regarding defendant's SUV catching fire on October 3, 2016.[1] Defendant told Rushing that a weed whacker had leaked gas inside the SUV. Rushing did not observe defendant suffering from injuries as a result of the fire. During a second interview two days later, defendant told Rushing that he was with Ledet, Witoski, and Williams on September 30, 2016. Specifically, defendant indicated that he dropped Ledet off between the Citgo gas station and VIP and watched him enter a white car with two Caucasian occupants. Rushing viewed video surveillance from Citgo during the relevant times and did not observe defendant drop off Ledet or Ledet enter a car.

¶ 14        The State played defendant's video recorded interview for the jury. In the recording, defendant explained that he was a landscaper and had set a weed whacker on the front passenger seat floor of the SUV. Defendant owned a broken weed whacker that was at his house. While defendant smoked crack in the SUV, he set the hot lighter down, and the seat ignited. Defendant admitted that the SUV was noisy and stated you could "hear it coming." Defendant consumed drugs the entire weekend prior to the fire. Defendant described seeing Ledet at Citgo and VIP at approximately 10 or 11 p.m. on September 30, 2016, with a Caucasian male and female. Defendant took Ledet to the trailer and smoked crack until Ledet wanted to leave. Defendant, Witoski, and Ledet left the trailer and dropped off Ledet at the Citgo and VIP around midnight. Defendant observed Ledet enter the white car with two Caucasian occupants. Defendant stated that cameras should show him dropping Ledet off. Defendant and Witoski returned to the trailer and consumed more drugs. Witoski left, and defendant stayed at the trailer overnight with Taylor, Williams, and several other individuals.

---

[1]The evidence showed that defendant's wife owned the SUV, however, defendant regularly used the SUV as it was the only one the couple possessed.

¶ 15    On cross-examination, Rushing stated that he did not review the surveillance video from VIP. Rushing did not investigate whether the weed whacker observed at defendant's residence was the weed whacker defendant indicated was broken. Defendant agreed to provide a DNA sample and submit to a gunshot residue test.

¶ 16    Officer Zach Johnston executed a consensual search at defendant's residence on October 5, 2016. During the search, Johnston observed a weed whacker inside the front door, various ammunition, and an empty black firearm box in the bedroom. Johnston did not locate a firearm. Johnston described the residence as "unsanitary" and "very dirty," and the backyard as having a "junkyard feel" with "a lot of garbage," old cars, and scrap metal. Johnston did not observe ammunition "readily apparent" on or near the porch. Johnston returned to defendant's residence on November 2, 2016, with a search warrant. During this search, Johnston observed a POF 9-millimeter shell casing on the porch. Johnston did not see the shell casing during the first search or until another officer lifted a rug by the door. Two other shell casings of a different caliber were located by the door. Johnston did not find the black firearm box he had observed during the consensual search. Lieutenant Kraig Horstman testified that he investigated the information from the firearm box, and it belonged to a "Taurus Millennium 9-millimeter handgun."

¶ 17    Detective Joni Hart searched defendant's burned SUV on October 5, 2016. Hart did not observe a weed whacker or any remnants of a weed whacker in the SUV. The SUV also had a large hole in the muffler. On November 2, 2016, Hart executed a search warrant at defendant's residence. Hart located a weed whacker by the front door and pruning shears on the living room couch. Shotgun shells, miscellaneous ammunition, and casings were located in the bedroom. Two 9-millimeter shell casings labeled "Blazer Luger" and one 9-millimeter shell casing labeled "R-P Luger" were found outside by the porch. On the porch and near the back door, a 9-millimeter shell

8

casing labeled "POF 80 2Z" was recovered. A rifle cartridge and several other shell casings were also located outside. On cross-examination, Hart testified the burned SUV was not inspected after it was towed and was left at a secured location before they could conduct the October 5, 2016, search. Additionally, Hart did not ensure that no one entered or tampered with defendant's residence prior to their entry.

¶ 18     The autopsy on Ledet revealed that he had a bruised and swollen right eye caused by a skull fracture and an abrasion on his forehead "caused by him possibly falling" and "scraping of the skin." Additionally, Ledet had two gunshot wounds, one entering from the left side of the back of his head and the other entering on his left cheek, resulting in his death. Both gunshots were determined to have been fired from within two feet of Ledet. One bullet was recovered from Ledet's skull. Ledet tested positive for cocaine, heroin, and marijuana. A crime scene investigator took casts of two tire track impressions and collected a 9-millimeter live round and shell casing from the scene of the murder.

¶ 19     Jeff Parise, a forensic scientist, testified that the "POF" shell casings originated from a rare manufacturer, "Pakistan Ordinance Factory." The shell casings and live round recovered from Ledet, the scene, and defendant's residence were manufactured by POF. Parise determined the shell casings recovered from defendant's residence and the scene were fired from the same firearm. On cross-examination, Parise explained that due to the damage to the shell casing recovered from Ledet, he could not say that the bullet was fired from a 9-millimeter firearm, only that there were several firearms in the ".38 class caliber family" that included a 9-millimeter firearm that could have fired the bullet.

¶ 20     The parties stipulated the tire tracks from the scene were compared to the tire tracks from defendant's burned SUV. Two of the burned SUV tires had a similar "tire tread pattern or design"

9

as the tire marks at the scene; "however, neither an identification or elimination" could be made. The remaining two tires did not contribute to the tracks at the scene. The parties also stipulated the live round found at the scene contained no human DNA or fingerprints suitable for comparison.

¶ 21 The court denied defendant's motion for a directed verdict. Defense counsel called Kankakee Chief Investigator Scott Allen, who had interviewed Witoski several times. In each interview, Witoski gave additional information not previously disclosed and somewhat contradictory. In the first interview, Witoski denied being with Ledet the night of the murder. In his second interview, Witoski stated that he was with Ledet at the time of the murder and heard three gunshots. The first gunshot occurred when he was outside of the SUV. The second shot he heard while inside the SUV. Witoski also stated that he traveled around "rural Pembroke" after the murder. In the third interview, Witoski stated that following the murder, defendant stopped at a residence that Witoski had not previously mentioned. On cross-examination, Allen described Witoski as reluctant to cooperate. Witoski did not provide any contradictory information regarding the actual shooting of Ledet.

¶ 22 Lieutenant Horstmann testified he interviewed Hance. Hance's story remained consistent, and he provided a description of Taylor, who he had encountered earlier on the day of the incident and police considered a potential person of interest. After Chief Chad Gessner interviewed other people of interest, they were no longer considered suspects.

¶ 23 During closing arguments, the State used a slide projector presentation and argued there were several disputed facts, including whether defendant "intentionally" burned his SUV. Defense counsel objected. Outside the presence of the jury, the State asserted it never agreed to not argue defendant "burned his vehicle on purpose." The court acknowledged the agreement was ambiguous. The State offered to remove the slide from their presentation to resolve the objection.

10

Counsel moved for a mistrial, stating the agreement specifically barred the State from arguing defendant intentionally set the fire. Counsel added that he did not believe the State made the argument in "bad faith." The court denied the motion and instructed the jury to "disregard anything that has been said about the Defendant intentionally burning his own vehicle."

¶ 24 Defense counsel argued that, according to Witoski's testimony, defendant shot Ledet in the SUV, but "Wouldn't that have broken the window?" Counsel suggested that other suspects could have committed the crime, but police did not sufficiently investigate them. Counsel also argued that Witoski's prior felony convictions made his testimony incredible.

¶ 25 In rebuttal, the State said,

> "[W]hat [defendant] thinks of these witnesses doesn't matter. What I think of them doesn't matter. You're the only one who judges their believability ***. *** [Defendant] is presumed innocent, but you will read nowhere in [the jury instructions] where [defendant] is presumed to be telling the truth. Judge his credibility the same way you would somebody else *** and the only testimony we have from him was through that video. So you decide who's telling the truth."

Later, the State remarked that Ledet had laid "there in that dirt driveway, two bullets to the head, doesn't [Ledet] and his family deserve justice, too?" The State addressed counsel's question regarding the broken window, stating, "Well, maybe we'd know that, but the car accidentally caught fire two days later. So we couldn't check it there. Remember at this time all they got is a body in the darkness ***, a shell casing and a live round, but on the third there's a mysterious car fire." The State continued,

> "[w]hen a witness says he was involved in the commission of a crime with the Defendant, the testimony of that witness is subject to suspicion, should be

11

considered by you with caution. It should be carefully examined in light of the other evidence in the case. Now, that applies to [Witoski]. But I think it applies to every witness. You should look at every one's witness' testimony with caution and look at it very carefully."

The State also commented that the jury observed each of the witnesses, including defendant via his recorded interview, and urged the jurors to "decide who's telling the truth." Following closing arguments, the court instructed the jury that "any statement or argument made by the attorney, which is not based on evidence, should be disregarded," and that only the jury were the "judges of the believability of the witnesses."

¶ 26 The jury found defendant guilty of both counts of first degree murder. Defense counsel renewed his motion for a mistrial and filed a motion for a new trial. In the motions, counsel argued that the State failed to file a motion permitting the characterization of defendant's SUV fire as an intentional act. Moreover, the State failed to inform the court that it intended to argue the fire was intentional. The court denied the motions. The court merged the counts and sentenced defendant to 55 years' imprisonment. This appeal followed.

¶ 27                                          II. ANALYSIS

¶ 28                                          A. Rule 431(b)

¶ 29 On appeal, defendant contends the trial court erred by failing to ask each prospective juror whether they understood and accepted the Rule 431(b) principles. Defendant concedes he failed to preserve the issue for review but asserts the error is reversible plain error because the evidence was closely balanced. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 30 Under the plain error doctrine, we must first determine whether a "plain error" occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). "The word 'plain' *** is synonymous with

12

'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If we determine the trial court committed a plain error, the second step is to determine whether that error is reversible. *Id.* at 565. A plain error is reversible when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* The defendant bears the burden of persuasion under both prongs. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Here defendant argues only that the court committed reversible error under the first prong. We thus limit our discussion.

¶ 31        Rule 431(b) requires the court to ask whether each juror

> "understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 32        Rule 431(b) "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court must ask each potential juror whether he or she "understands and accepts" each of the four principles listed in the rule. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *People v. Wilmington*, 2013 IL 112938, ¶¶ 30, 32. The court must then allow each prospective juror the opportunity to respond regarding their *understanding and acceptance* of those principles. *Thompson*, 238 Ill. 2d at 607. In the present case, the court erred by failing to specifically ask each juror whether they "understood and accepted" the Rule 431(b) principles and

13

instead asked whether they would "accept and follow" the principles. See *Wilmington*, 2013 IL 112938, ¶¶ 30, 32; see also *People v. Fulk*, 2021 IL App (3d) 190182-U, ¶ 24. Because the court committed a plain error, we must determine whether the evidence is closely balanced.

¶ 33        To determine if the evidence is closely balanced, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *People v. Belknap*, 2014 IL 117094, ¶ 50. This "inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *People v. Sebby*, 2017 IL 119445, ¶ 53. The court must take a qualitative approach to the evidence and consider it "within the context of the circumstances of the individual case." *People v. Adams*, 2012 IL 111168, ¶ 22. Evidence can be closely balanced when each party presents credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. *Sebby*, 2017 IL 119445, ¶ 63.

¶ 34        As charged in this case, the State needed to prove defendant (1) "perform[ed] the acts which cause[d] the death" of Ledet, and (2) "[knew] that such acts create[d] a strong probability of death or great bodily harm." Illinois Pattern Jury Instructions, Criminal, No. 7.01 (approved Dec. 8, 2011); 720 ILCS 5/9-1(a)(1), (2) (West 2016).

¶ 35        The State's case predominantly derived from Witoski's testimony. Witoski testified he saw defendant shoot and kill Ledet. Witoski's versions did not directly contradict one another, instead, he added information previously omitted. Witoski's testimony regarding the timeline and defendant's associates the night of the murder was corroborated by Williams, who saw defendant and Witoski with Ledet the night of the murder but did not see Ledet with them the next morning. Witoski's prior criminal history, varying accounts of the timeline of events, and drug use did not make his testimony so incredible as to create closely balanced facts. Instead, we find that once

14

Witoski informed police about the murder, his version regarding how the murder occurred remained consistent, including where he was, who he was with, how many gunshots he heard, and what defendant did with Ledet after the shooting. Moreover, the physical and forensic evidence supported Witoski's version where a cattle gate had been cut a short distance away from where Ledet was killed, and Ledet died from two gunshot wounds to his head that were fired within two feet. Additionally, the rare POF bullets found at the scene and at defendant's residence, in combination with Williams's testimony that he observed defendant with a firearm labeled "Millennial" the night of the murder, similar to the empty firearm box belonging to a "Millennium" firearm discovered at defendant's residence, provides further circumstantial evidence of defendant's guilt. The evidence presented in this case was not close. Therefore, the court's Rule 431(b) plain error is not reversible.

¶ 36                               B. Prosecutorial Misconduct

¶ 37        Defendant next contends the State committed prosecutorial misconduct when it (1) described defendant's SUV fire as intentional; (2) commented on defendant's right not to testify; (3) aroused the passions and sympathy of the jury; and (4) indoctrinated the jury venire with a predisposition to consider narcotics users testimony equal to all other witnesses. Defendant argues the cumulative effect of these errors deprived him of his right to a fair trial and warrant reversal. Defendant asserts he preserved his first claim and argues for plain error review on the remaining claims.

¶ 38                                      1. SUV Fire

¶ 39        At the outset, we note that the parties disagree on whether defendant preserved his claim that the State improperly characterized the SUV fire as intentional. While counsel stated he did not believe the State acted in "bad faith," he maintained his objection to the argument. Moreover,

15

counsel moved for a mistrial on that basis and renewed his motion posttrial. We find counsel's language describing the State's intention did not undermine his objection. See *Enoch*, 122 Ill. 2d at 186.

¶ 40 Prosecutors have wide latitude in the content of their closing arguments. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). The prosecutor may remark on the evidence and any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The State may also comment on uncontradicted evidence "even if the defendant was the only person who could have provided contrary proof." *People v. Keene*, 169 Ill. 2d 1, 21 (1995). Prosecutors may respond to comments made by defense counsel that clearly invite a response, and comment on the credibility of witnesses. *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 52.

¶ 41 In the present case, we find it necessary to first address the parties' "agreement" regarding the SUV fire. The record shows the agreement was, at best, vague. Despite the ambiguity, the court proceeded without clarification, a requirement to file a written motion, a written agreement, or issuing a written order. Instead, the court merely assumed the parties possessed the same understanding. The record clearly shows the State intended to explore defendant's explanation for the fire, while counsel intended to prevent the State from characterizing the fire as an intentional act. The court only clarified whether the State planned to present *testimony* that defendant set the fire intentionally. When the State indicated it would play defendant's interview, the court continued, "[a]s long as the officer doesn't allude differently to it." While we acknowledge counsel clearly intended to bar the State from arguing or characterizing the fire as an intentional act, we

16

can see no agreement by the State or order by the court preventing the State from arguing this reasonable inference. See *Nicholas*, 218 Ill. 2d at 121. Without an order or agreement to the contrary, the inference the State drew from the evidence—that defendant intentionally set the SUV fire—was reasonable. Moreover, the State's comment regarding the "mysterious" nature of defendant's SUV fire was an invited comment based on counsel's argument that the State failed to present evidence of a shattered window due to gunfire. See *People v. Munson*, 206 Ill. 2d 104, 145 (2002) ("A prosecutor may respond to comments made by defense counsel in closing argument that clearly invite a response."); see also *Ammons*, 2021 IL App (3d) 150743, ¶¶ 43, 52. Therefore, the State's comments regarding the SUV fire were not error.

¶ 42    However, even assuming the State's initial comments were improper, we find any error was harmless. Harmless error review requires us to consider "whether there was any reasonable probability the jury would have acquitted defendant absent the State's error" in its closing argument. *People v. Pinkett*, 2023 IL 127223, ¶ 40. The State's argument possessed minimal prejudicial effect as, immediately after the State's remarks, the court instructed the jury to disregard the State's argument. Further, prior to deliberations, the court instructed the jury that "any statement or argument made by the attorney, which is not based on the evidence, should be disregarded," and that only the jury were the "judges of the believability of the witnesses." See *People v. Birge*, 2021 IL 125644, ¶ 40 (jurors are presumed to have followed the court's instructions). Therefore, we cannot say there is any reasonable probability that the jury would not have convicted defendant absent this error and the trial court did not err in denying counsel's motion for mistrial. See *Pinkett*, 2023 IL 127223, ¶ 40; see also *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29 (where a motion for a mistrial has been denied, in addition to establishing

17

prejudice, an appellant must also demonstrate that court admonishments and curative instructions could not remedy the damage from the improper comments).

¶ 43                                    2. Defendant's Right to Testify

¶ 44        Defendant concedes he failed to preserve the next three prosecutorial misconduct claims but asks that we consider them under the plain error doctrine. See *Enoch*, 122 Ill. 2d at 186. Accordingly, we must first determine whether an error occurred. See *Piatkowski*, 225 Ill. 2d at 564-65.

¶ 45        "An argument that serves no purpose but to inflame the jury constitutes error." *Ammons*, 2021 IL App (3d) 150743, ¶ 43. Additionally, a prosecutor may not make arguments seeking to "engender an 'us-versus-them' mentality." *People v. Johnson*, 208 Ill. 2d 53, 80 (2003). When a prosecutor's comment "exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant [citation], taking into account 'the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Williams*, 192 Ill. 2d 548, 573 (2000) (quoting *People v. Kliner*, 185 Ill. 2d 81, 152 (1998)).

¶ 46        Here, during closing arguments, the prosecutor told the jury to "[j]udge [defendant's] credibility the same" as other witnesses and "the only testimony we have from [defendant] was through that video." Viewing the prosecutor's statements in the context of the whole argument, the State did not comment on defendant's right to testify. Instead, the prosecutor, at most, asked the jury to consider defendant's interview against Witoski's testimony. See *Johnson*, 208 Ill. 2d at 111 (the jury is "entitled to consider any such evidence as it bore upon the credibility or the weight to be given" to defendant's statement and did not constitute a comment on defendant's fifth amendment right). Moreover, the State sought to remind the jury it could consider defendant's

18

credibility in the interview and that they were the judges of believability of all parties involved. Thus, the comment was not improper and not error.

¶ 47                                  3. Inflame the Passions of the Jury

¶ 48        Next, the State's comment, "doesn't [Ledet] and his family deserve justice, too?" is not reversible error. This statement amounted to a single passing reference that was not a part of the State's overarching argument and did not amount to a pervasive pattern of prosecutorial misconduct that resulted in "incit[ing] the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation." See *id.* at 79; see also *Ammons*, 2021 IL App (3d) 150743, ¶ 55. Moreover, the comment did not suggest the jurors would personally suffer adverse consequences if they did not return a guilty verdict. See *Ammons*, 2021 IL App (3d) 150743, ¶ 53. Therefore, the comment was neither inflammatory nor fell outside the wide latitude permitted in closing arguments. See *Johnson*, 208 Ill. 2d. at 79. Even assuming the comment constitutes error, defendant concedes that this error, alone, is insufficient to warrant reversal.

¶ 49                                  4. Questioning During *Voir Dire*

¶ 50        Lastly, the State did not unfairly indoctrinate the jury by submitting *voir dire* questions related to the jurors' potential biases toward individuals who consume narcotics. "The constitutional right to a jury trial encompasses the right to an impartial jury." *People v. Rinehart*, 2012 IL 111719, ¶ 16. "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). *Voir dire* questions "must not be 'a means of indoctrinating a jury, or impaneling a jury with a particular predisposition.' [Citation.] Rather than a bright-line rule, this is a continuum. Broad questions are

19

generally permissible." *Rinehart*, 2012 IL 111719, ¶ 17 (quoting *People v. Bowel*, 111 Ill. 2d 58, 64 (1986)). The State may inquire whether venire members have deep-seated beliefs that prevent them from returning a guilty verdict. *People v. Faulkner*, 186 Ill. App. 3d 1013, 1025 (1989).

¶ 51    The State's proposed *voir dire* questions asked whether (1) a witness's admission to consuming narcotics would affect how the jurors viewed that witnesses' testimony, (2) the jurors believed that they could judge the credibility of a person who has consumed narcotics the same as any other witness, and (3) the jurors had any biases against narcotics users that would prevent their ability to be fair and impartial. While the questions include a description of the State's witness, it does not indoctrinate the jury with a particular predisposition. See *Rinehart*, 2012 IL 111719, ¶ 17. These questions allowed the State to broadly determine whether any potential juror had a strong belief or predisposition about a person that consumed narcotics that such a bias would prevent a juror from returning a guilty verdict. See *id.* The generality of the State's questions rendered the questions incapable of indoctrinating the jury. Moreover, the posed questions benefited both defendant and the State, where defendant, Ledet, and two of the State's witnesses were alleged to have habitually consumed narcotics. Therefore, the questions were proper, and no error occurred. See *id.*

¶ 52    We reject defendant's argument that the State's questioning went against the "well-established" principle that "narcotics abusers are not credible individuals and instead are 'notorious liars.' " See *People v. Herman*, 407 Ill. App. 3d 688, 705 (2011). While we believe the credibility of any individual witness is fertile grounds for questioning, we disagree *Herman* established a general principle that drug abusers are inherently untrustworthy. Therefore, the State's *voir dire* questions did not indoctrinate the jury in opposition to the law.

¶ 53                                5. Cumulative Error

20

¶ 54        Finally, defendant claims the cumulative effect of the State's misconduct constitutes plain error requiring reversal. As we have found no pervasive pattern of prosecutorial misconduct, the alleged errors do not amount to reversible error on any individual issues, and there is no cumulative error. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005); see also *Johnson*, 208 Ill. 2d at 64 ("Absent reversible error, there can be no plain error.").

### III. CONCLUSION

¶ 55        For the reasons stated, we affirm the judgment of the circuit court of Kankakee County is affirmed.

¶ 56        Affirmed.