**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220423-U

Order filed January 24, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-22-0423 |
| v. | ) ) | Circuit No. 19-CF-524 |
| ANDRE T. LEE, | ) ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Justices Brennan and Hettel concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The State proved defendant guilty beyond a reasonable doubt of second degree murder. (2) The State's questions during cross-examination and comments during closing argument were not reversible plain error. (3) The Department of Corrections improperly added one year of mandatory supervised release.

¶ 2    Defendant, Andre T. Lee, appeals his conviction for second degree murder, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State committed prosecutorial misconduct during its cross-examination of defendant and closing argument; and

(3) the Department of Corrections (DOC) improperly added one year of mandatory supervised release (MSR) to defendant's sentence. We affirm in part and modify in part.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) and one count of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2018)). The indictment alleged that defendant, without lawful justification, shot Terrell Love, causing his death. The court granted defendant's motion to sever the UPWF offense, and the case proceeded to a jury trial on March 7, 2022.

¶ 5        Shenadra Washington testified that on July 24, 2019, while in her car with her three children in the parking lot of her apartment complex, she observed defendant and another individual, later identified as Tereece Roundtree, walking toward the parking lot. Soon after, Washington saw Terrell's vehicle pull into the parking lot and park next to her car. Terrell exited his vehicle, walked up to another individual, and shook their hand. Terrell then approached defendant and Roundtree. From a distance of approximately 20 feet, Washington heard defendant and Terrell "exchange[ ] words" and Terrell tell defendant that "he wanted to fight." At this point, defendant and Terrell were "face-to-face." When defendant responded that he had a gun, Terrell said, "blow that bitch." Defendant brandished a gun and shot Terrell. Washington heard "a couple shots." On cross-examination, Washington testified that she knew defendant through mutual acquaintances but did not know Roundtree or Terrell. Washington admitted that she told police that defendant did not want to fight Terrell. Terrell approached defendant calmly. Washington saw the entire encounter and did not observe Terrell lunge at defendant.

¶ 6        The State published the surveillance video from the parking lot that corroborated Washington's observations of defendant and Roundtree walking by the parking lot and Terrell's

vehicle pulling into the parking lot. Approximately two minutes later, defendant and Roundtree ran away from the parking lot.

¶ 7        Priscilla Love testified that on July 24, 2019, she was with her cousin, Terrell. Earlier that day, Terrell and Priscilla were driving when a car "cross[ed] in front" of their car and then came to a stop. Priscilla observed the driver say "stuff at the window." Priscilla stopped Terrell from exiting the car and confronting the individuals. Later, Priscilla identified defendant in a photographic lineup as the passenger in the car and Roundtree as the driver. On cross-examination, Priscilla stated that everyone remained in their cars, and she did not observe any weapons. Following the shooting, several individuals showed Priscilla photographs of defendant before she identified him in the photographic lineup. The parties stipulated that Priscilla had pending charges for using a forged credit card.

¶ 8        Kankakee Police Officer Jack Klasey testified that on July 24, 2019, he heard three gunshots while on patrol, and within minutes located Terrell in the parking lot. There were 15 to 20 people near Terrell when he arrived. The forensic pathologist testified that Terrell was 192 pounds and 6 feet tall. Terrell had three gunshot wounds located in his neck, chest, and abdomen, causing his death. On July 24, 2019, Officer Scott Monferdini conducted the crime scene investigation and noted that there were no weapons in Terrell's car. On July 27, 2019, defendant's parole officer informed defendant that they needed to meet in person that day. Defendant did not meet with the parole officer, and a warrant was issued.

¶ 9        Defendant testified that on July 24, 2019, at approximately 4:30 p.m., he left his house for the first time that day to help Roundtree with his car. After their unsuccessful attempt to start the car, they walked past the apartment complex parking lot, as captured on the surveillance video. Defendant observed Terrell's vehicle pull into the parking lot "as if he was *** in a hurry" and

3

park near where defendant stood with Roundtree. Terrell exited his car and "pointed towards [defendant] and [Roundtree]" and said a name that did not refer to either individual. Then Terrell "kept walking back and forth erratically and said one of you are going to have to come see me." Terrell "repeated the phrase" two more times. Defendant was confused because he "didn't know what [Terrell] was referring to." Terrell walked up to a group of individuals and had a "hush conversation" with one of them. Defendant saw Terrell "point discretely back and forth" between him and Roundtree. Terrell "kept walking back and forth *** pulling up his pants," and saying, "One of y'all are gonna have to come see me." Terrell was approximately 25 feet away from defendant. Defendant realized that Terrell was "talking about fighting." Defendant told Terrell, "you're tweaking and I don't know you. I don't know what your problem is. We don't have no reason to fight you." Defendant turned to walk away, and "the moment [defendant] turned [his] back on Terrell *** [he] heard an individual yell watch out" and saw "Terrell lunging within arm's reach as if he was pulling up his pants and reaching out as attempting to grab me." Defendant was "terrified, anxious, scared, [and] confused." Defendant was afraid Terrell was going to make "Physical contact. Physical bodily harm." Defendant discharged his gun because he was "terrified" when Terrell charged at him. Defendant did not know whether Terrell had a weapon. Defendant closed his eyes, shot Terrell, and ran home.

¶ 10        Defendant carried a gun for "general protection" due to the gun violence in his neighborhood, and he would "rather be safe than sorry." Defendant knew Terrell in passing but had never spoken to or had conflicts with him and denied being with Roundtree in a car earlier that day. Defendant was 20 years old at the time of the murder and described his physique as approximately five foot, eight inches and 125 pounds. Defendant was on parole for possession of a stolen firearm.

4

¶ 11    On cross-examination, the State asked whether defendant recalled Washington's testimony that Terrell "walked over to you and Mr. Roundtree and said, I hear you want to fight me?" When defendant acknowledged the testimony, the State asked, "[b]ut you're saying that never happened?" Defendant answered, "No, sir. Not in that order, sir." Later, defendant agreed that he was "calm and cool" when Terrell arrived. Defendant recalled Washington's testimony that Terrell was the calm individual in the situation. Defendant denied that his parole officer asked to meet with him, and instead, contended that the parole officer told him to contact him when he returned to town. Defendant was not afraid until Terrell "attempt[ed] to attack" defendant. Defendant said he was "at the wrong place at the wrong time." Defense counsel admitted Terrell's 2011 felony conviction for robbery into evidence, stating that Terrell took the property of an individual "by the use of force or by threatening the imminent use of force."

¶ 12    In closing arguments, the State asserted that the evidence presented established "defendant intended to kill." As evidence of that intention, the State argued that defendant made "several choices," including (1) concealing a firearm, (2) the number of gunshots fired, and (3) where defendant shot Terrell. The State also argued that Terrell "approached the defendant. So the defendant let [Terrell] come up to him, and there's a reason for that. *** it's easier to hit an object or a person the closer they are to you whether you're *** shooting them or throwing a snowball." The State continued that it had proven the proposition that defendant

> "knew the act, as far as pulling the trigger, created a strong probability of death or great bodily harm to the victim. *** At close range the defendant chose to fire a deadly weapon three times into an area where the victim had vital organs. Of course, you're going to do great bodily harm and probably kill them if you do something like that."

5

The State additionally asserted that defendant "was not justified in using the force which he used." In support, the State cited the facts that: (1) Terrell was unarmed; (2) defendant did not testify that he was afraid he would be killed, or subject to great bodily harm; and (3) Terrell gave no verbal threats. The State concluded that "the evidence clearly shows that [Terrell] posed no immediate threat of death or great bodily harm," and defendant's actions were unjustifiable. Defendant "knew that he had a loaded gun. The safety was off. A round was in the chamber. He's ready to rock and roll. He outnumbered [Terrell]. *** It was daylight out. So he could clearly see what [Terrell] had. *** [Terrell] had no weapon."

¶ 13    In his closing argument, defense counsel responded to the State's assertion that defendant allowed Terrell to approach him and stated, "what reason did Terrell *** even have to approach [defendant]? *** [A] moment ago you heard [the State] almost make it sound like [defendant] lured [Terrell] in. Like he—he wanted him to come up because it would be easier to kill him. No. *** Terrell approached [defendant]." Counsel continued that Terrell "came to [defendant]. Not the reverse. And he certainly wasn't lured in. There's no evidence to substantiate that ***." Counsel asserted that they had presented sufficient evidence for self-defense, including: (1) that Terrell was larger and older than defendant; (2) defendant was afraid; and (3) Terrell "instigated" the violence when he approached defendant and "threaten[ed] him." Counsel argued that Washington, the sole witness, was not credible because she was distracted by her three children at the time of the murder. Counsel argued that "there were about 15 or 20 people on scene ***. *** Unfortunately we haven't heard from any of them." Counsel asserted that defendant was "a scared young man [who] went to pull his gun out" to protect himself as opposed to being a calculated killer.

¶ 14    In rebuttal argument, the State argued that defense counsel essentially stated, "[d]on't believe anyone else. Believe me. Don't believe [Priscilla] ***" who saw defendant, referring to

him as "Mr. Unluckiest Man in the World," and "don't believe [Washington]." The State posed the question, "[w]hy would [Washington] fabricate this whole thing of [']I hear you want to fight me?['] *** There's no reason for her to say that." Later, the State asked, "[w]hat does Ms. Washington gain by coming in here and lying? *** She gains nothing." When discussing Washington's participation in the photographic lineup, the State said,

> "[c]onsider the courage that takes.*** That's the kind of person Ms. Washington was. She was the one of all 25 people or so that was standing around there that had the courage to go to the police and talk ***. *** [Y]ou take that into consideration *** when you're hearing the testimony of Ms. Washington."

The State discussed defendant's explanation for carrying a firearm and stated that Washington "should have put a gun in each one of her kids' pockets and everyone else should have a gun, too. Come on. I carry a gun because of the shootings. Give me a break. He had a gun on him at that time and he had a purpose." The State contended that defendant testified, "believe me. Ignore everyone else ***." Later, the State continued,

> "don't believe them, believe me, *** I'm an innocent guy. I'm the victim of this whole thing. I'm the victim of the circumstances.
>
> Can you believe this? What was his other comment there? *** I love the one, better safe than sorry. Better to be safe than sorry. *** I guess he's not too sorry that he shot an unarmed man.
>
> ***
>
> [Terrell] is at fault. He's the guy that should be responsible for this. Hold him responsible. That's what the defense says, because [Terrell] approached [defendant]."

7

The State asserted that defendant wanted the jury to believe his parole officer told him to "take [his] time" and "come by any old time [he] want[s]." The State commented that defendant's gun "happened" to have a bullet in the chamber, "ready to go with the safety off. Give me a break. That he carries a gun just for his protection." The State asserted that defendant had not provided evidence that justified the use of deadly force and his "ridiculous testimony puts out there of how, oh, yeah, well I closed my eyes and it just happened. Give me a break." Finally, the State commented that defendant's explanation for failing to report for parole was "stupid."

¶ 15    Following closing arguments, the court instructed that only the jurors "are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them"; "you should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness"; and "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." The jury found defendant guilty of the lesser included offense of second degree murder, and not guilty of first degree murder. The court denied defendant's motion notwithstanding the verdict. The court sentenced defendant to 18 years' imprisonment and 1 year of MSR. Defendant pled guilty to UPWF, and the court imposed a consecutive 7 years' imprisonment with 1 year of MSR. Defendant appealed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, defendant argues that (1) the State failed to prove him guilty beyond a reasonable doubt of second degree murder; (2) the State committed prosecutorial misconduct during its cross-examination of defendant and closing argument; and (3) the DOC improperly added a year of MSR to defendant's sentence.

8

¶ 18                          A. Sufficiency of the Evidence

¶ 19        Defendant argues the State failed to prove him guilty beyond a reasonable doubt of second

degree murder where he raised a justifiable claim of self-defense. When a defendant makes a

challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People*

*v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

When presented with a challenge to the sufficiency of the evidence, we will not retry a defendant

and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*,

2013 IL 113510, ¶ 42. "A conviction will be reversed only where the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People*

*v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 20        Here, defendant was charged with first degree murder. To prove defendant guilty of first

degree murder, the State was required to show that defendant caused the death of Terrell when he

(1) "intend[ed] to kill or do great bodily harm to that individual"; (2) "knows that such acts will

cause death to that individual"; or (3) "knows that such acts create a strong probability of death or

great bodily harm." Illinois Pattern Jury Instructions, Criminal, No. 7.01 (approved Jan. 30, 2015)

(hereinafter IPI Criminal No. 7.01); 720 ILCS 5/9-1 (West 2018). A jury may find a defendant

guilty of the lesser included offense of second degree murder, if it finds that defendant established

an "imperfect self-defense" (*People v. Jeffries*, 164 Ill. 2d 104, 113 (1995)), when "at the time of

the killing the defendant believes that circumstances exist which would justify the deadly force he

uses, but his belief that such circumstances exist is unreasonable." IPI Criminal No. 7.05; see 720

ILCS 5/9-2(a)(2), (d) (West 2018). However, "a person is justified in the use of force which is

intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." IPI Criminal No. 24-25.06 (4th ed. 2000). "The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder." IPI Criminal No. 7.06; 720 ILCS 5/9-2(c) (West 2018).

¶ 21    Self-defense consists of six factors:

"(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35.

Defendant must prove each factor of self-defense by a preponderance of the evidence. *People v. Castellano*, 2015 IL App (1st) 133874, ¶¶ 154, 156. "[O]nce the defendant proves a mitigating factor by a preponderance of the evidence, the State has the burden to disprove it beyond a reasonable doubt." *Id.* ¶ 154.

¶ 22    Here, we must determine whether, in light of defendant's self-defense claim, the State proved beyond a reasonable doubt that the deadly force he used was not objectively reasonable. Initially, we note that defendant did not suffer any actual physical contact from Terrell. Instead, defendant testified that Terrell "attempt[ed] to grab" him, and as a result, defendant feared Terrell would make imminent "[p]hysical contact" and "[p]hysical bodily harm." See *cf. People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense *** justifying [the] use of deadly force."). Additionally, Terrell made no verbal or physical threats beyond telling defendant to "come see" him, which defendant understood

10

to mean "fighting." See *People v. Everette*, 141 Ill. 2d 147, 161 (1990) ("Threats alone will not justify the use of deadly force \*\*\*."). While defendant asserted that he subjectively feared Terrell's imminent physical harm, due to Terrell's demeanor, larger build, age, and act of "lunging," the jury was not required to believe defendant's account of the incident. See *People v. Purdle*, 212 Ill. App. 3d 594, 598 (1991); *People v. Akis*, 63 Ill. 2d 296, 298 (1976) ("[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence.").

¶ 23 Further, Washington's testimony that Terrell was calm and did not lunge at defendant, presented a version that contradicted defendant's story that Terrell was the initial aggressor and the danger of harm to defendant was imminent. The additional facts that defendant was outside and in an unenclosed area when Terrell approached him alone, and defendant did not believe that Terrell had a weapon, while defendant himself concealed a loaded firearm, further weigh against his claim of self-defense. Importantly, defendant did not fear that Terrell would inflict *great* bodily harm or death to justify the deadly force he used. As a result, defendant failed to present a claim of perfect self-defense, and we cannot say that no rational jury would find defendant's subjective belief was objectively unreasonable so as to set aside the conviction for second degree murder.

¶ 24                                B. Prosecutorial Errors

¶ 25 Defendant argues the State committed several errors during their cross-examination of defendant and closing argument. Specifically, defendant contends the State (1) asked defendant to comment on the credibility of a State's witness on cross-examination and in closing argument; (2) misrepresented a material fact; (3) implied that defendant had asserted that "everyone else was lying"; (4) vouched for the credibility of a State's witness; and (5) improperly belittled defendant and his theory of the case. These alleged errors are forfeited, and defendant asks for plain error

11

review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant first argues that he established the first prong of plain error for each alleged error. Second, defendant argues that the cumulative effect of the combined prosecutorial errors satisfies the second prong of the plain error analysis.

¶ 26    The plain error doctrine allows a reviewing court to consider an otherwise forfeited error when " '(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence.' " *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Under the first prong, to determine whether the evidence is close, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. The determination is not one of the sufficiency of the evidence, but "the closeness of sufficient evidence." *Id.* ¶ 60. To determine if the evidence is closely balanced, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *Belknap*, 2014 IL 117094, ¶ 50. Evidence can be closely balanced when each party presents credible witnesses. *Sebby*, 2017 IL 119445, ¶ 63. Under the second prong, "[p]rejudice to the defendant is presumed because of the importance of the right involved." *Herron*, 215 Ill. 2d at 187. The defendant bears the burden of persuasion under both prongs. *Id.* The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 27                                    1. Cross-Examination

¶ 28    We have long held that the State may not question a criminal defendant regarding his opinion on the veracity of other witnesses' testimony. See *People v. Leonard*, 391 Ill. App. 3d 926, 936 (2009). This manner of questioning intrudes on the trier of fact's function of determining the witnesses' credibility. See *People v. Mitchell*, 200 Ill. App. 3d 969, 977 (1990). "In spite of the

impropriety of such questioning during cross-examination, it will not be reversible error if it can be considered harmless." *Leonard*, 391 Ill. App. 3d at 936.

¶ 29   Here, the State confronted defendant with Washington's testimony when it asked whether defendant recalled Washington testifying that she (1) heard Terrell say, "I hear you want to fight me," and then asked "[b]ut you're saying that never happened?"; and (2) observed that Terrell was calm. We find the State's questions did not ask defendant to comment directly on Washington's testimony where the State merely asked defendant to acknowledge testimony that contradicted his own. See *cf. People v. Becker*, 239 Ill. 2d 215, 236 (2010) (the court properly excluded expert witness testimony that would comment on the victim's testimony in a manner that "would 'educate' people why they 'should or should not put weight on [the victim's] credibility one way or the other").

¶ 30   Even assuming the State's questioning was error, the evidence in this case was not closely balanced. See *Piatkowski*, 225 Ill. 2d at 565. As we previously found, the State presented sufficient evidence to uphold defendant's conviction for second degree murder. *Supra* ¶¶ 22-23. The closely balanced analysis differs from the sufficiency of the evidence analysis where, here, we may consider the evidence on the elements of the offense, "along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 31   The State's case relied on Washington's testimony, which was corroborated by the surveillance video. Additionally, defendant's testimony corroborated Washington's on several points of significance, including that Terrell approached defendant, defendant and Terrell exchanged words, and defendant did not want to fight Terrell. Washington's credible testimony that Terrell was calm and did not lunge at defendant, makes defendant's assertions that Terrell was the initial aggressor and there was an imminent danger of harm, unlikely and incredible. *Supra*

13

¶¶ 22-23; see *Sebby*, 2017 IL 119445, ¶ 63. Moreover, to the extent that defendant argues Terrell's actions justify his use of deadly force, defendant's testimony was implausible. See *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31 (there is no credibility contest where one party's account is "unrefuted, implausible, or corroborated by other evidence."). Specifically, Terrell did not make physical contact or verbal threats, and defendant did not fear the imminence of great bodily harm or death. *Supra* ¶¶ 22-23. This case did not turn on a credibility issue, instead, defendant did not sufficiently establish self-defense. See *cf. People v. Naylor*, 229 Ill. 2d 584, 608 (2008) (evidence may be considered closely balanced when the trier of fact's verdict is primarily based on its credibility determination). Thus, reversal is not required where the evidence is not closely balanced.

¶ 32                                    2. Closing Argument

¶ 33        Prosecutors have wide latitude in the content of their closing arguments. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). The prosecutor may remark on the evidence and any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Prosecutors may respond to comments made by defense counsel that clearly invite a response, and comment on the credibility of witnesses. *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 52. "Generally, improper closing arguments by the State will constitute reversible error only if there is doubt as to whether the jury would have rendered a guilty verdict in the absence of the comments." *People v. Libberton*, 346 Ill. App. 3d 912, 924 (2003). When a "prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant [citation], taking

14

into account 'the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Williams*, 192 Ill. 2d 548, 573 (2000) (quoting *People v. Kliner*, 185 Ill. 2d 81, 152 (1998)).

¶ 34    First, defendant argues that the State misrepresented evidence where it suggested that the evidence showed that defendant lured Terrell to approach him. On its face, the State's comments were an accurate interpretation of the evidence, that Terrell "approached the defendant." The State's comment that defendant "let" Terrell approach him, was a reasonable inference from the evidence presented, given defendant's testimony that he was "calm and cool," while Terrell was "erratic[ ]" and "tweaking." Moreover, we note that the State never used the word "lured"; it was defense counsel that characterized defendant's action as "lur[ing]" when he interpreted the State's argument and asserted that "[t]here's no evidence to substantiate that ***." Therefore, viewing the argument in context, the statements were not improper. See *Nicholas*, 218 Ill. 2d at 121.

¶ 35    Second, defendant alleges that the State improperly implied that the defense theory was "everyone else was lying" and equated the State's argument to the improper assertion that "to believe the defense witnesses the jury must find that each of the State's witnesses was lying." *People v. Wilson*, 199 Ill. App. 3d 792, 796 (1990). Here, the State's argument that defendant wanted the jury to "believe" him and "[i]gnore everyone else" fell short of instructing the jury that to acquit defendant, they must find that the State's witnesses were lying. Therefore, the argument was not error.

¶ 36    Third, defendant contends that the State improperly vouched for the credibility of its witness. Here, the State's rebuttal comments asked the jury "[w]hy would [Washington] fabricate this whole thing ***. *** There's no reason for her to say that," "[w]hat does [she] gain by coming in here and lying? *** She gains nothing[,]" noted that Washington was the only witness, among

15

approximately 25 individuals present at the scene, who had the "courage" to speak to police, and asked the jury to consider "the kind of person" Washington was when evaluating her testimony. These comments were in direct response to defense counsel's closing argument that Washington was not credible because she was distracted at the time of the murder and that "there were about 15 or 20 people on scene" and the jury had not "heard from any of them." See *Ammons*, 2021 IL App (3d) 150743, ¶ 52; *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Therefore, the State's comments were not improper when they directly responded to defendant's argument. See, *e.g.*, *People v. Glasper*, 234 Ill. 2d 173, 208 (2009) (finding the State's closing argument comment was not error because they were invited by defense counsel's comments). Even assuming that the State's remarks were improper, the evidence is not closely balanced. *Supra* ¶¶ 30-31.

¶ 37 Lastly, defendant contends that the State improperly belittled him and his theory of the case. Defendant cites instances where the State (1) called him "Mr. Unluckiest Man in the World" in reference to defendant's assertion that "witnesses were fabricating their testimony"; (2) stated that defendant's testimony that he "closed [his] eyes and it just happened," and that his parole officer told him to "come by any old time you want" as "ridiculous" and the latter as "lies"; (3) called his explanation for not returning upon his parole officer's request, "stupid"; (4) commented on defendant's explanation for carrying a gun by stating "[c]ome on. I carry a gun because of the shootings. Give me a break," and suggested that Washington's children should also carry guns; and (5) commented on defendant's argument that he was "the victim of the circumstances." Here, the State's argument was akin to a comment on defendant's credibility and in response to defense counsel's argument that the evidence showed that defendant was "a scared young man [who] went to pull his gun out" to protect himself as opposed to defendant being a calculated killer. The State posed fair questions regarding whether the evidence unfavorable to

16

defendant could reasonably be attributed to coincidence. See *Nicholas*, 218 Ill. 2d at 121; *People v. Glasper*, 234 Ill. 2d 173, 207 (2009) (holding the State's comments in closing regarding defense counsel "mocking" or "making fun of" the witnesses in cross-examination were not an inappropriate personal attack amounting to error). Moreover, any alleged errors did not cause substantial prejudice to defendant when considering the closing argument as a whole and in the context in which the statements were made. *Williams*, 192 Ill. 2d at 573.

¶ 38                                3. Cumulative Error

¶ 39        Finally, defendant claims that the cumulative effect of the State's conduct constitutes plain error requiring reversal. The supreme court has equated the second prong of plain error review with structural error such that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Glasper*, 234 Ill. 2d at 197-98 (quoting *Herron*, 215 Ill. 2d at 186). Importantly, defendant has not suggested that structural error can be attributed to any one of the five individual errors standing alone. After careful review of the record, we find that any cumulative impact of the prosecutor's cross-examination and closing argument comments did not rise to the level of second-prong plain error. Specifically, any error is not of such magnitude that it eroded the integrity of the judicial process and infringed on defendant's right to a fair trial or constituted a material factor in defendant's conviction. See *Wheeler*, 226 Ill. 2d at 123. Additionally, the court's instructions limited any prejudice caused by the error. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 98 (a circuit court may cure a prosecutor's improper remarks through its jury instructions). Accordingly, the State's errors were not so egregious, even cumulatively, as to deprive defendant of his right to a fair trial.

¶ 40                                      C. MSR

¶ 41    Lastly, defendant contends that the DOC improperly added a year of MSR to the one-year term imposed by the circuit court.[1] While the court sentenced defendant to a consecutive prison term for UPWF, a Class 2 felony (720 ILCS 5/24-1.1(e) (West 2020)), defendant's MSR term applies only to the most serious offense, second degree murder, a Class 1 felony (730 ILCS 5/5-8-1(d)(2) (West 2020)). See *Round v. Lamb*, 2017 IL 122271, ¶ 20 ("[D]efendant must serve all consecutive prison terms and then serve the MSR term for the most serious offense"); 730 ILCS 5/5-8-4(g)(2) (West 2020). Accordingly, we accept the State's concession of error and exercise our powers under Illinois Supreme Court Rule 615(b)(4) and modify defendant's MSR term from two years to one year. See 730 ILCS 5/5-8-1(d)(2) (West 2020).

¶ 42                              III. CONCLUSION

¶ 43    The judgment of the circuit court of Kankakee County is affirmed in part, and modified in part.

¶ 44    Affirmed in part, and modified in part.

---

[1]We take judicial notice of defendant's imprisonment records as they are displayed on the DOC website, which show the imposition of two years' MSR. See *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010) (the appellate court may take judicial notice of the public records of the DOC.)